UNITED STATES of America,
Plaintiff-Appellee,

v.

Joe BERTRAM, Jimmy Lester, and
William A. Oesterritter,
Defendants-Appellants.

No. 85–8694.

United States Court of Appeals,
Eleventh Circuit.

Dec. 17, 1986.

Donald F. Samuel, Atlanta, Ga., for Bertram.

Douglas N. Peters, James D. Burns, Decatur, Ga., for Lester.

Thomas E. Clay, Louisville, Ky., for Oesterritter.

Edgar W. Ennis, Jr., Asst. U.S. Atty., Macon, Ga., for U.S.

Before CLARK, Circuit Judge, and HENDERSON * and WISDOM,** Senior Circuit Judges.

WISDOM, Senior Circuit Judge:

In this appeal the three defendants, Joe Bertram, Jimmy Lester, and William Oesterritter, were convicted for conspiring to manufacture, possess with the intent to distribute, and distribute methamphetamine. Bertram was also convicted on two substantive counts of distributing methamphetamine. Six codefendants did not go to trial. We affirm.

## I. *Facts*

The facts are confusing and in dispute on several key points. According to the government's scenario, Bertram was the mastermind of the conspiracy, Lester the chemist, and Oesterritter the chemical supplier. Bertram and his ex-wife, Kathy, who were living together, produced phenyl–2–propanone (P2P), with the help of a chemistry student at one of the Georgia universities. P2P is an immediate precursor of methamphetamine. ("Precursor" chemicals are not controlled substances, but may be combined with other chemicals to make controlled substances.) Bertram would take the P2P to co-defendant Roberts who would convert it into methamphetamine, which Bertram would sell. After state authorities arrested Roberts in 1983, co-defendant Ousley introduced co-defendant Lester to Bertram as a chemist who would replace Roberts. The three agreed that Bertram and Lester would each receive 40 percent and Ousley 20 percent of the methamphetamine produced. They operated under this agreement for several months.

On September 1, 1984, Kathy Bertram, who had quarreled with Joe Bertram over personal problems, reported to the Police Department of Athens, Georgia, that he was engaged in illegal drug activities. She substantiated her accusation by leading the police to a trailer, where she and Bertram lived and where one of Bertram's laboratories was located. A search of the house, without a warrant, led to the seizure of inculpatory evidence. Police searched the house a second time that day, again without a warrant, on Mrs. Bertram's oral permission.

The parties disagree over how entry was gained to the house, the government asserting that Kathy used her key and she asserting that she broke a window through which she crawled to enter the home. The parties also disagree over whether Kathy had free access to the house. This conflicting evidence exists because Kathy changed her mind about her husband between her telephone call to the police and the trial. At a suppression hearing, she testified that she had no right to consent to a search, yet admitted under cross-examination that she had access to the house.

* *See* Rule 3(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable John Minor Wisdom, Senior U.S. Circuit Judge for the Fifth Circuit Judge, sitting by designation.

The day after the house was searched, police seized, at another location, a letter from Lester to Bertram. In that letter, Lester proposed a modification to the financial agreement involving himself, Bertram, and Ousley. The day after the search of the laboratory site in Athens, Bertram, Lester, and Ousley were arrested at still another laboratory site in Lawrenceville, Georgia. Following their arrests, Lester wrote Bertram berating him because of Kathy Bertram's causing the arrests. Kathy obtained the letter and turned it over to the Athens Police Department. The government established, through the testimony of a handwriting expert, that Defendant Lester was the author of the writings on a liquor bottle, seized at the house, and on two letters.

In each of the laboratories, law enforcement officers seized glassware, precursor chemicals (the ingredients of methamphetamine), paraphernalia, as well as some methamphetamine. At trial, numerous members of the conspiracy testified about their activities in acquiring precursor chemicals from co-defendant Oesterritter and working with Bertram in the manufacture of methamphetamine.

The lengthy trial[1] was characterized by extremely numerous objections from the trial attorneys and by evidentiary rulings and remarks from bench. We have stated the basic facts; additional facts will be referred to in the point by point discussion of the contentions raised on appeal. Each appellant adopts the relevant arguments made by the other appellants.

## II. *The Search and Seizure*

In considering a district court's denial of a motion to suppress evidence, this Court reviews the findings of fact and credibility choices under the clearly erroneous rule.[2] In applying the rule, this Court accepts the evidence in the light most favorable to the government.[3]

Mrs. Bertram called the Athens Police Department in the early hours of September 1, 1984 from her room in a Howard Johnson motel. Sergeant Linda Evans, responding to a radio call from the police, went to Mrs. Bertram's room. There Mrs. Bertram said that Joe Bertram had left the motel and had taken with him her daughter Kelly, aged fourteen, without her permission. He was not the father of the child and had no right to her custody. At the trial, Sergeant Evans said that Mrs. Bertram had been drinking, but was "coherent", "could walk fine", "could talk okay and make sense". (This testimony contradicts Joe Bertram's statement that she was drunk and did not know what she was saying.) Mrs. Bertram was "upset" because she was "afraid that Kelly was in serious trouble". She was "obviously afraid, more so than [one] would've thought"; she and her other daughter Karen, aged thirteen, were "exchanging glances like she wasn't telling ... the whole story". When Sergeant Evans asked "was there some reason why she thought her daughter may be in danger", she "sort of physically folded or collapsed". She said "You just don't know what all's involved." Then, she began to tell Evans "about a laboratory where methamphetamines were made". She believed Mr. Bertram was on his way to pick up another of his cars, one that "was loaded with methamphetamine".

Mrs. Bertram turned over to Sergeant Evans what she said "was pure speed (methamphetamine) from a suitcase that she had". She had not been placed under arrest and had not been searched. She handed over four plastic bags with a quantity of this white substance and a hypodermic needle. At that point, Sergeant Evans called Detective Charles Crews with the Drug Unit for the City of Athens and

---

1. The record consists of two volumes of filed pleadings and eight volumes of transcript.

2. *United States v. Bergouignan,* 764 F.2d 1503, 1509 (11th Cir.1985); *United States v. Arends,* 776 F.2d 262, 264 (11th Cir.1985).

3. *United States v. Sarda-Villa,* 760 F.2d 1232, 1235 (11th Cir.1985); *United States v. Arends,* 776 F.2d 262, 264 (11th Cir.1985).

asked him to come to the motel. When he arrived, Mrs. Bertram repeated to him her previous conversation with Sergeant Evans.

"During the whole conversation Mrs. Bertram kept referring to the speed that she was cooking on the stove right then." She said, "I'll show you where it is." She could describe only the colors of the car Mr. Bertram was to pick up, but "she stated that she thought she had the tag number at this place where the speed was cooking". At that point she was anxious about her daughter, Kelly, and thought that Kelly might "possibly be in some severe danger".

The three drove to a mobile home that "pretty much had been made stationary" on the outskirts of the city. The front door was locked. Mrs. Bertram said, "the keys were on the ignition keys", left in the car. Sergeant Evans took the keys from the car and gave them to Mrs. Bertram who opened the front door with a key. A large dog which belonged to Mrs. Bertram barked in a frightening manner and continued to bark. Evans had no intention of entering while the dog was there. Mrs. Bertram "went around back and got the dog out the back door so we could come in". Mrs. Bertram, from inside, then opened the front door and the officers entered. The officers did not specifically ask for consent to enter, because Mrs. Bertram "had kept asking us (Evans and Crews) to go with her to that house all evening".

According to Evans, Mrs. Bertram represented that she was living at the house with her two children and Joe Bertram. She was "very familiar with everything inside the house"; she pointed out two of the bedrooms her children used; she had plants inside and outside "to make this look like a regular home"; she gave every indication that she occupied the house. She knew all of the contents of the house; identified furniture she had bought; and said that she had lived there for some time. A telephone bill dated June 22, 1984, was addressed to "K. Bertram", for the telephone in the house. She showed the officers a dish that was on the top of the stove that was indeed cooking. She gave them a white substance from a wooden box. "Everything [they] took was contraband and was handed [over] specifically by her". "What she handed ... [over] was readily identified as contraband."

Sergeant Evans did not see how Mrs. Bertram entered the premises but she did notice that the "sliding glass door (in the back) when [they] walked in was slightly ajar". She did not "recall a window that could've been crawled through in the back".

Detective Crews testified to the same effect as Sergeant Evans. He said that he and other officers were granted permission to enter the house.

By the time the suppression hearing was held, Kathy Bertram had changed her mind about her live-in, ex-husband, Joe Bertram. Then and at the trial, she was antagonistic to the prosecution. She denied calling the police; said that she had been quarreling with her husband and that because of their noise others in the motel must have called the police. She said that at the time she was drunk. She denied that it was her house to which she took the police; denied that she had a key (she said she had given her key to Lester the day before); denied that she was "authorized" to let anyone in the house; said that the lease was in someone else's name (it was in co-defendant Ousley's name). Mrs. Bertram testified that she entered the house by crawling through a window. She denied mentioning that drugs were cooking on the stove; instead, she said that there was a pan of acetone on the stove.

On cross-examination and in response to questions from the court, she admitted that she had had a key until the previous day. She said she had given it to defendant Lester, presumably because he had lost his. She admitted keeping her dog and personal property at the house. She admitted hav-

ing lived there "off and on"; admitted being able to come and go as she pleased without asking anyone's permission. She admitted participating in the manufacturing process at the house. She admitted giving the address of the house as that of her home on registering at the motel. She admitted living with Bertram at the house. She explained that she and the girls would often check into a motel when manufacturing was going on at the house because she did not like the smell. She explained that she had been staying at the motel immediately prior to September 1 because defendant Bertram had been out of town and she did not want to stay at the house alone. She admitted that she could have chosen to stay at the house whenever she wanted to. She admitted that she had been in the house as recently as the day preceding the search; she fed her dog there everyday.

■ Based on the testimony at the suppression hearing, the trial judge's finding that Mrs. Bertram freely gave her consent to the entry to the house was not clearly erroneous. In *United States v. Matlock*,[4] the Supreme Court held that "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."

Mr. Bertram contends that Mrs. Bertram could not waive his right to be protected from a warrantless search under the fourth amendment; that her obvious hostility toward him made that consent invalid and

unauthorized. That contention is inapposite to this situation; here the search was not based on the apparent delegated authority from Bertram, but on the fact that she had joint access and control over the premises. The right of the police to enter and search is buttressed by Mrs. Bertram's admission that she participated in the illegal operation carried on in the house. This is not a case where the doctrine of "apparent authority" is used as an excuse to erode rights protected by the fourth amendment. Kathy Bertram had actual authority, though common authority, with Joe Bertram of access and control of the house. There was no ambiguous authority in Mrs. Bertram's conduct. And there was no unlawful police conduct to deter under the exclusionary rule. Mrs. Bertram's reasons for allowing the police to enter primarily related to the assumed kidnapping of her daughter: (1) to find the tag number of the car which Bertram was driving or would drive, so that the child would be found; (2) to show the extent of the illegal operations, which carried a danger to the child. The police would have been remiss if they had rejected Mrs. Bertram's urgings that they accompany her to her home.

The search of the house and the seizure of some of its contents were lawful.

### III. *Judicial Misconduct*

Oesterritter and Bertram contend that the trial judge improperly injected himself into the proceeding, denying the defendants their right to a fair trial.[5] They say that the trial judge "interrupted" the defense more than eighty times and that the interruptions clearly conveyed to the jury that the attorneys for the defendants (1) did not know the rules of evidence, (2) ignored or deliberately violated those few

---

**4.** 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974).

**5.** Oesterritter and Bertram argue in their briefs that the trial judge was "improper, rude and overbearing"; that throughout the trial, he treated all defense counsel with ridicule and contempt, both in and out of the jury's presence. He was "profane". ("Never heard of this kind

of crap.") It was virtually impossible for any defense attorney to complete a sentence without Judge Owens interrupting. "These discussions of the law and rules of evidence as perceived by the Trial Judge were in fact diatribes directed against defense counsel both in open court and at bench conferences which were supposedly [but were not] out of the hearing of the jury."

rules they did know, (3) attempted repeatedly to inject irrelevant and immaterial evidence before the jury, and (4) were attempting "to try" the DEA, the Precursor Program, Stan Jones, Russ Jerkins, Cliff Best, "the investigators," and "the whole program".

■ It is certainly true that an objective demeanor on the part of a trial judge is crucial to a fair trial. It is also true that "a trial is a quest for truth, and a federal judge is more than a neutral arbiter".[6] He may, within reasonable limits, comment on the evidence and curtail the presentation of evidence. The role of a district judge has been well described in the following language:

> [A] federal judge is not a mere moderator of proceedings. *See Herron v. Southern Pacific Co.,* 1931, 283 U.S. 91, 95, 51 S.Ct. 383, 384, 75 L.Ed. 857. He is a common law judge having that authority historically exercised by judges in the common law process. He may comment on the evidence, *Quercia v. United States,* 1933, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321, may question witnesses and elicit facts not yet adduced or clarify those previously presented, *Kyle v. United States,* 5 Cir.1968, 402

F.2d 443, 444; Fed.R.Evid. 614(b), and may maintain the pace of the trial by interrupting or cutting off counsel as a matter of discretion, *United States v. Hill,* 5 Cir.1974, 496 F.2d 201, 202. Only when the judge's conduct strays from neutrality is the defendant thereby denied a constitutionally fair trial. *United States v. Jacquillon,* 5 Cir.1972, 469 F.2d 380, 387, *cert. denied,* 1973, 410 U.S. 938, 93 S.Ct. 1400, 35 L.Ed.2d 604.[7]

■ This Court has read the record and examined, *in context,* the trial judge's thirty-five "egregious" interruptions quoted in the Oesterritter brief. Considering the length of the trial, the vigor displayed by the attorneys for the defense and for the prosecution, some provocation by the lawyers in pursuing irrelevant lines of inquiry, and the cautionary instructions to the jury,[8] we hold that the trial judge did not intrude himself to such an extent that he showed bias in favor of the prosecution or prejudice against the defendants or their attorneys. This does not mean that the trial judge was never wrong or that his demeanor could serve as a model of judicial objectivity. We mean that the trial judge's "interruptions" and his judicial attitude were not so obtrusive or prejudicial as to deny the defendants a fair trial.

6. *United States v. Hickman,* 592 F.2d 931, 934 (6th Cir.1979).

7. *Moore v. United States,* 598 F.2d 439, 442 (5th Cir.1979).

8. Furthermore, the trial judge instructed the jury at the outset:
> When the lawyers have finished questioning each witness, if they have failed to inquire into some factual area that the Court thinks you ought to know about to be able to decide the case, the Court may also question a witness. If the Court does that, it will not be for the purpose of assisting either side of the case, either the Government or any defendant.

During the trial, the judge instructed the jury as follows:
> The lawyer for the Government, the lawyer for each defendant is in the role of an advocate; that is, under our system of justice, it is their responsibility under the law and the rules of the Court to present their side of the case. It's kind of similar to an argument that

we might each get involved in where we each are arguing and doing our best to present our side of the case. That's their duty and their responsibility. They would be shirking their duty if they did not endeavor to do so. The trial judge sits in the middle. When we have vigorous advocates on each side, as we have in this case, the middle sometimes gets a little hotter than it might otherwise get but there's nothing wrong with strong argument. That's the role that the lawyers play. If you perceive or if you think for any reason that something that a lawyer for either side is doing is not what should be done or stronger than it should be or weaker than it should be, do not let that reflect adversely upon the person represented by that lawyer. Remember that each lawyer is here properly in the role of an advocate.

At the conclusion of the trial, the judge gave the following instruction:
> Also, you should not assume from anything that I may have said that I have any opinion concerning any of the issues in this case.

## IV. Curtailment of Cross-Examination and Exclusion of Evidence

Oesterritter and Bertram contend that the trial court denied them their sixth amendment right of confrontation and their right to effective assistance of counsel.[9]

A. By the time of the trial, Kathy Bertram was antagonistic to the prosecution. The United States attorney therefore severely limited his direct examination of her to such matters as identifying photographs and the evidentiary items she had turned over to the police officers. Her brief testimony concerning Joe Bertram's involvement in the manufacture of methamphetamine was cumulative. Defendants complain that they were not allowed to discredit Kathy Bertram on a number of grounds but focused on allegations of her sexual relationship with law enforcement agents. This evidence was offered to show not only her motivation to testify falsely, but also to show motivation by the agents to exaggerate Joe Bertram's participation and minimize her participation in the conspiracy. She not he, they contended, was the master-mind of the alleged conspiracy.

■ The trial judge excluded the evidence of her alleged sexual misconduct because it was not probative of bias or prejudice and did not invoke deceit, untruthfulness, or falsification bearing upon the propensity of the witness to testify truthfully or falsely. The defendants' argument is not wholly without a modicum of merit, but the trial judge here acted within the large measure of discretion accorded a trial judge by Fed.R.Evid. 403 and 608(b).[10]

B. The defendants argue that the trial court's curtailment of cross-examination and the exclusion of certain relevant evidence deprived them of due process, effective assistance of counsel, and the right of confrontation. They assert the trial judge repeatedly prohibited the cross-examination of government witnesses' use of drugs, distribution of drugs, and other acts of misconduct probative of their motivation to testify falsely. (1) They say that had they been allowed, they would have proved that Vincent Heuser received marijuana from Kathy Bertram; that a DEA agent told him to flush it down the toilet; and that this testimony would have shown a motive to lie about Joe Bertram and to curry favor with the DEA and the United States Attorney.[11] (2) They argue that they should have been allowed to show that Stan Jones, a co-defendant, had not paid his taxes in years, and that one could infer a motive to testify falsely to shield himself from a tax prosecution. (3) The defendants argue that the jury might have discredited David Curringer if it had heard that he had offered methamphetamine to Kelly Bertram, a fourteen-year old, and had encouraged her to use alcohol. Curringer, a co-defendant had pleaded guilty. (4) Oesterritter complains that he was not permitted to develop his reasons for firing Vincent Heuser who had reported to the DEA his employer's dealings with Bertram. But Oesterritter admitted that the report to the DEA was the crowning point that caused him to fire Heuser. Moreover, on direct examination, Oesterritter was permitted to state all his reasons for the firing. (5) Contrary to defendant Oesterritter's representations, Agent Best did testify that the defendant had been a paid DEA informant and that he had received about $2,100 in payments. (6) Whether there were other companies participating in the Precursor Liaison Program and whether they reported transactions with defendant Bertram bears no rel-

9. See United States v. Carter, 760 F.2d 1568, 1581 (11th Cir.1985); United States v. Mayer, 556 F.2d 245, 248 (5th Cir.1977).

10. See, United States v. Harris, 542 F.2d 1283, 1302 (7th Cir.1976), cert. denied, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); United States v. Alvarado, 519 F.2d 1133, 1135 (5th Cir.1975), cert. denied, 424 U.S. 911, 96 S.Ct. 1107, 47 L.Ed.2d 315 (1976).

11. This appears to have been a bona fide oversight by Bertram's attorney. Heuser did testify about this matter.

evance to the guilt or innocence of defendant Oesterritter.

■ We conclude that the rulings were within the discretion of the trial judge.

C. Defendant Lester makes one contention on appeal: he argues that the trial court erred in refusing to allow cross-examination of a handwriting expert based on excerpts from a book, Conway, *Evidential Documents.*

■ The court accepted as a qualified expert Ms. Nancy Davis, a document examiner employed by the Georgia State Criminal Laboratory. Counsel for Lester attempted to show that her method of comparison of the questioned documents was not a professional method. The excerpts related to a chapter in the book on anonymous (poison pen) letters. The trial judge ruled that the question did not go to the validity of Ms. Davis's method for comparison; that there was no time to go through the whole chapter of the book, and that the excerpt counsel proposed to read to the witness, "taken out of context" "doesn't go to the heart of her testimony at all". Possibly another judge, had he tried the case, would have allowed the question and gone on with the trial. The identification of the inculpatory writings of Lester's, however, was not a close question. We conclude that, assuming that the court erred—we do not make the assumption—the error was harmless.

Considering all of the contentions regarding the trial judge's evidentiary rulings and recognizing that the trial of this case would not take any prize as a model of trial procedure, we hold that none of the rulings exceeded the discretion accorded a trial judge in trying a long, hotly contested case in which the evidence of guilt was overwhelming.

V. *Sufficiency of Evidence to Establish Oesterritter's Guilt of Conspiracy*

■ Oesterritter contends that the evidence was insufficient to support the jury's verdict that he was guilty of conspiracy. The standard for review here is whether the evidence viewed in the light most favorable to the United States, supports the verdict.[12] "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilty, provided that a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence."[13] To convict a supplier of goods of conspiracy it must be shown (1) that the seller knew that the buyer intended to use the goods illegally and (2) that the seller intended to promote the illegal enterprise.[14]

■ Oesterritter was a chemist, a participant in the DEA Precursor Liaison Program, and he had established Raven Science, Inc., primarily to sell his products to clandestine drug manufacturers. He knew what Bertram would do with the chemicals Oesterritter sold to him. Oesterritter knew that Bertram was making methamphetamine and to help him sent Heuser with instructions. Oesterritter instructed Heuser not to report Bertram to the DEA and fired Heuser, inferentially because

**12.** *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Thomas,* 676 F.2d 531, 535 (11th Cir. 1982); *United States v. Smith,* 700 F.2d 627, 632 (11th Cir.1983).

**13.** *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.Unit B 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983); *see also, United States v. Carcaise,* 763 F.2d 1328, 1330–1331 (11th Cir.1985); *United States v. Lee,* 695 F.2d 515, 517 (11th Cir.),

*cert. denied,* 464 U.S. 839, 104 S.Ct. 130, 78 L.Ed.2d 125 (1983); *United States v. Smith,* 700 F.2d 627, 632 (11th Cir.1983).

**14.** *United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); *Direct Sales Co. v. United States,* 319 U.S. 703, 708–13, 63 S.Ct. 1265, 1268–70, 87 L.Ed. 1674 (1943); Note, *Falcone Revisited: the Criminality of Sales to an Illegal Enterprise,* 53 Colum.L.Rev. 228 (1953).

Heuser had reported Bertram to the DEA. After being warned by the DEA, Oesterritter continued to sell to Bertram, without disclosing that fact to the DEA. He kept no records of his dealings with Bertram, and he made frequent deliveries to Bertram at parking lots or other off-site locations.

We hold that this evidence and the inferences to be drawn from it are sufficient to support the evidence of Oesterritter's guilt.

\* \* \*

This Court has carefully considered all of the contentions raised on this appeal by all the defendants, whether or not discussed in this opinion.

The judgments of conviction are AFFIRMED.