[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-13515
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 31, 2011
JOHN LEY
CLERK

D.C. Docket No. 1:09-cr-20046-JAL-19

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CRISTIAN FIGUEROA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 31, 2011)

Before TJOFLAT, HULL and KRAVITCH, Circuit Judges.

PER CURIAM:

Cristian Figueroa appeals his conviction for possession of a firearm in

furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

Figueroa argues that the district court erred in denying his motion to suppress the

evidence seized from his residence.[1]  After review, we affirm.

## I.  BACKGROUND FACTS

### A.  Arrest and Search

In January 2007, the Drug Enforcement Administration ("DEA") began

investigating a heroin distribution operation involving Defendant Cristian

Figueroa, as well as his brother, Raymond Figueroa, and their father, Ramon

Figueroa.  Under the supervision of DEA agent William Hodge, a confidential

informant ("CI") made at least ten monitored telephone calls to two cell phone

numbers used by Defendant Figueroa to arrange heroin sales.  As a result of the

CI's information and assistance, DEA agents made five controlled purchases of

heroin from Defendant Figueroa.  However, charges do not appear to have ever

been pursued based on this investigation.

Meanwhile, the DEA, with Agent Hodge in charge, was also investigating a

suspected drug dealer named Rafael Rodriguez.  As part of this separate

investigation, DEA agents placed a wiretap on Rodriguez's phone.  On June 5,

---

[1]Some documents in the record refer to the defendant as Christin or Christian.  For consistency with the case caption, we refer to the defendant as Cristian Figueroa.

2008, agents monitored a call to Rodriguez ordering heroin. The call came from one of the cell phone numbers used by Defendant Figueroa in the earlier 2007 investigation. Before a grand jury, Agent Hodge subsequently testified that the man heard ordering the heroin in the June 5, 2008 recorded call to Rodriguez was Defendant Figueroa and that Rodriguez was Defendant Figueroa's supplier.[2]

On January 22, 2009, the grand jury indicted Rodriguez, Defendant Figueroa and seventeen other defendants on various drug-related charges. Specifically, Defendant Figueroa was charged in Count 18 with one count of conspiracy to possess with intent to distribute heroin based on the June 5, 2008 call to Rodriguez.

**B.    Search**

Based on the indictment, the next day, January 23, 2009, agents obtained a warrant for Defendant Figueroa's arrest. When agents arrived at Figueroa's apartment at 6:00 a.m. and arrested him, Figueroa gave written consent to search his apartment. During the search, agents found two firearms and various drugs.

In light of the evidence found during the apartment search, on June 4, 2009, the government filed a superseding indictment charging Defendant Figueroa with

---

[2]Agent Hodge did not testify to the grand jury about the 2007 controlled purchases and those events were not charged in the indictment.

three counts of possession of a controlled substance with intent to distribute (Counts 19 through 21), one count of being a felon in possession of a firearm (Count 22), and one count of possessing a firearm in furtherance of a drug trafficking crime (Count 23), in addition to the heroin conspiracy charged in the original indictment (Count 18). Later, it was determined that the voice in the recorded June 5, 2008 telephone call to Rodriguez belonged to Defendant Figueroa's brother, and the government dismissed Count 18.

## C. Motion to Suppress

Defendant Figueroa filed a motion to suppress the evidence found in his apartment arguing that: (1) his consent to the search was involuntary because he was intoxicated at the time; and, alternatively, (2) the search was tainted by his illegal arrest.

At a suppression hearing before a magistrate judge, DEA Agent Hodge testified that when he appeared before the grand jury he believed Defendant Figueroa had placed the June 2008 call to Rodriguez. Hodge explained that during the 2007 investigation the CI, who had been reliable in the past: (1) identified two cell phone numbers associated with Defendant Figueroa; (2) told the DEA agents that the person answering the calls to order the heroin was Defendant Figueroa; (3) provided a physical description of Defendant Figueroa,

4

including a distinctive facial scar; and (4) identified Defendant Figueroa by photograph.

Hodge also knew that: (1) one of the two cell phone numbers linked to Defendant Figueroa during the 2007 investigation was used to place the June 5, 2008 call to Rodriguez; (2) that DEA agents conducting surveillance had observed Defendant Figueroa and his brother meet with Rodriguez to purchase the heroin ordered during the call; and (3) that Defendant Figueroa had a distinctive way of speaking. Based on Agent Hodge's personal knowledge of Defendant Figueroa's voice from the 2007 investigation and the information from the other DEA agents, Agent Hodge concluded that Defendant Figueroa had placed the June 5, 2008 call to Rodriguez.

DEA Agent Casey Brown testified about the wiretap investigation of Rafael Rodriguez and described how agents identified callers to the target phone. On May 28, 2008, agents intercepted a call to Rodriguez from one of Defendant Figueroa's known cell phone numbers. Agents obtained a voice sample from one of Defendant Figueroa's recorded calls in the 2007 investigation. A Spanish-speaking agent, Frank Casanovas, compared the sample to the May 28, 2008 phone recording. Agent Casnovas concluded that the two voices were very similar, but he could not be sure it was Defendant Figueroa. Subsequently, agents

5

concluded that the person in the May 29, 2008 call was Defendant Figueroa's brother Raymond.

On June 5, 2008, agents intercepted a call on Rodriguez's phone from the other cell phone number linked to Defendant Figueroa. The June 5 call also ordered heroin from Rodriguez. Agent Casanovas compared the June 5 recording to the 2007 voice sample of Defendant Figueroa and to the May 28, 2008 recording of his brother Raymond's call. Agent Casanovas concluded that the voices in the May 28 and June 5 calls were very close, but that "there were some different inflections . . . that made him believe" that the June 5 call was placed by Defendant Figueroa rather than his brother Raymond. When agents conducted surveillance of the drug transaction, both Defendant Figueroa and his brother Raymond appeared and Defendant Figueroa walked up to the driver-side of Rodriguez's car.

FBI agent Jose Perez testified about Defendant Figueroa's arrest and the search of his apartment. On January 23, 2009, Figueroa was arrested at his apartment at approximately 6:00 a.m. After placing Figueroa in handcuffs, Agent Perez explained that he wanted to search the apartment, but that he needed Figueroa's consent to do so. Figueroa seemed coherent and capable of knowingly granting consent because Figueroa responded clearly to Agent Perez's questions.

6

Though Figueroa appeared slightly dazed, Agent Perez attributed this to the fact that a SWAT team had just broken down Figueroa's door at six in the morning. Accordingly, Agent Perez produced and read a consent to search form to Figueroa, which Figueroa subsequently signed.

Agent Perez did not ask Figueroa whether he was under the influence of drugs, alcohol or medication. Agent Perez explained that he had professional experience interacting with intoxicated people and that Figueroa did not appear intoxicated at the search scene. A couple of hours later, however, while Agent Perez conducted intake procedures at the command post, Figueroa began exhibiting signs of intoxication. Although Figueroa admitted using heroin the night before, Figueroa was able to provide Agent Perez his identifying information. Agent Perez believed Figueroa was still coherent, responsive and able to understand the situation.

DEA Agent Pete Yates testified that he assisted with Figueroa's arrest, observed Figueroa inside the apartment and interacted with Figueroa outside in the patrol car. In the apartment, Figueroa looked a little groggy or lethargic, but a short time later, Figueroa seemed coherent and able to understand what Yates said to him.

Lastly, Figueroa testified that he had suffered a gunshot wound to the face

in 2002.  Figueroa admitted using heroin for about ten years, and, since January 2009, using heroin every day.  When using heroin, Figueroa was unable to interact with other people or understand what they said to him.  Figueroa did not know how long these effects lasted, and said that heroin usually made him fall asleep.  Figueroa took Xanax and heroin on the evening of January 22, 2009, but he could not recall when he used the heroin or when he went to sleep.  He also could not remember the events of his arrest because he was still high on heroin.

## D.    Denial of Motion to Suppress

The magistrate judge issued a Report and Recommendation ("R&R") concluding that Figueroa's arrest was lawful and finding that Figueroa voluntarily consented to the search of his apartment.  The R&R credited Agent Perez's testimony and found Figueroa's testimony as to his intoxication at the time of consent unreliable and incredible.  Accordingly, the R&R recommended denying the motion to suppress.  The district court adopted the R&R over Figueroa's objections, finding no reason to disturb the magistrate judge's credibility determinations.

Figueroa entered a conditional guilty plea to Count 23 of the superseding indictment.  The plea agreement preserved Figueroa's right to appeal the district court's denial of the motion to suppress.  The district court accepted Figueroa's

guilty plea and sentenced him to the statutory mandatory minimum of five years'

imprisonment. The district court dismissed the remaining counts. Figueroa filed

this appeal.

## II. DISCUSSION

On appeal, Figueroa argues that his consent to the search of his apartment

was not voluntary because he had used heroin and Xanax the night before.[3]

Consent to conduct a search is voluntary if it is the product of an

"essentially free and unconstrained choice." United States v. Purcell, 236 F.3d

1274, 1281 (11th Cir. 2001). Voluntariness of consent depends on the totality of

the circumstances. Id. In evaluating voluntariness, we examine several factors,

including "the presence of coercive police procedures, the extent of the

defendant's cooperation with the officer, the defendant's awareness of his right to

refuse consent, the defendant's education and intelligence, and the defendant's

belief that no incriminating evidence will be found." Id. A claim of intoxication

does not necessarily vitiate consent. See United States v. Bertram, 805 F.2d 1524,

---

[3]The district court's denial of a motion to suppress presents a mixed question of law and fact, and we review the district court's findings of fact for clear error and its application of the law to those facts de novo. United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006). The voluntariness of a consent to search is a factual determination we will not reverse unless it is clearly erroneous. United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002). We construe the facts in this case in the light most favorable to the government, as it was the prevailing party in the district court. United States v. Newsome, 475 F.3d 1221, 1223-24 (11th Cir. 2007).

1526-28 (11th Cir. 1986) (upholding finding that defendant's wife freely gave consent to enter home where she had been drinking but officer testified she was coherent); see also Hubbard v. Haley, 317 F.3d 1245, 1253-54 (11th Cir. 2003) (concluding defendant's statement was freely given even though he had consumed alcohol); United States v. Postal, 589 F.2d 862, 890 n.45 (5th Cir. 1979) (noting that defendants' claimed intoxication was only one factor to consider in determining the voluntariness of their consent to search).

The only circumstance Figueroa points to in support of his claim that his consent was involuntary is his use of heroin and Xanax the previous evening. However, the magistrate judge discredited Figueroa's claim that he was intoxicated at the time of his consent. We must defer to the magistrate judge's credibility determination "unless his understanding of the facts appears to be 'unbelievable.'" United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002). Agents Perez and Yates testified that when Figueroa gave his consent to the search, he was coherent and appeared to understand what was happening. Nothing in the record suggests that this version of the facts "is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." Id.

Agent Perez further testified that no coercion was involved in obtaining

10

Figueroa's consent, Figueroa was aware of his rights and, after giving consent, Figueroa denied that any incriminating evidence would be found in his apartment. Given the totality of the circumstances, the district court's finding that Figueroa's consent was voluntary is not clearly erroneous.

Alternatively, Figueroa argues that the search was tainted by his illegal arrest. Where voluntary consent to search follows an illegal arrest, the evidence gathered from the search must be suppressed as tainted "fruit of the poisonous tree" if the consent was the product of the illegal arrest. United States v. Delancy, 502 F.3d 1297, 1308 (11th Cir. 2007). Here, however, Figueroa's arrest was legal.

Figueroa was arrested pursuant to a warrant that was based on a grand jury's facially valid indictment.[4] A grand jury's indictment is sufficient to satisfy the Fourth Amendment's probable cause requirement. See Kalina v. Fletcher, 522 U.S. 118, 129, 118 S. Ct. 502, 509 (1997) ("The Fourth Amendment requires that

---

[4]Under the Costello rule, "the validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." United States v. Calandra, 414 U.S. 338, 344-45, 94 S. Ct. 613, 618 (1974); see Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 408-09 (1956); United States v. Norton, 867 F.2d 1354, 1358 (11th Cir. 1989). Although there is an exception where the government acts in bad faith, the government's inadvertently providing a grand jury with false testimony does not amount to bad faith. See United States v. DiBernardo, 775 F.2d 1470, 1475 (11th Cir. 1985).

Notably, Figueroa never moved to dismiss or quash the indictment based on bad faith. Furthermore, the record shows that DEA agents mistakenly attributed certain calls to Figueroa and that when Agent Hodge appeared before the grand jury, he testified erroneously, but in good faith, that Figueroa's voice was the one recorded in the June 2008 call to Rodriguez.

11

arrest warrants be based upon probable cause, supported by Oath or affirmation–a requirement that may be satisfied by an indictment returned by a grand jury . . . ." (quotation marks omitted)); <u>Gerstein v. Pugh</u>, 420 U.S. 103, 117 n.19, 95 S. Ct. 854, 865 n.19 (noting that a facially valid indictment returned by a properly constituted grand jury "conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry").  Thus, the agents' search of Figueroa's apartment was not tainted by an illegal arrest.

For these reasons, the district court properly denied Figueroa's motion to suppress the evidence found during the search of his apartment.

**AFFIRMED.**