**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Eugene JENKINS, Defendant–Appellant.**

**No. 89–8101.**

United States Court of Appeals,
Eleventh Circuit.

May 22, 1990.

As Amended May 24, 1990.

James W. Ellison, Burnside, Wall and Daniel, Augusta, Ga., for defendant-appellant.

J. Michael Faulkner, Asst. U.S. Atty., Augusta, Ga., Joseph Douglas Wilson, Atty., DOJ, Appellate Section, Crim.Div., Washington, D.C., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, and JOHNSON and HATCHETT, Circuit Judges.

JOHNSON, Circuit Judge:

Eugene Jenkins appeals his conviction for bank larceny under 18 U.S.C.A. § 2113(b).

## I. STATEMENT OF THE CASE

First Union Bank in Augusta, Georgia employed Eugene Jenkins as a security guard. Prior to January 1, 1988, the bank itself employed all of its security guards. On January 1, First Union executed a contract with a private security company named Sizemore Security. Sizemore offered all of the First Union security guards jobs with Sizemore, but at a lesser hourly salary and with a loss of all previously accrued benefits. Sizemore gave the guards approximately 48 hours to decide whether to accept its offer.

Before the change, First Union employed one guard on the first floor and one on the fourth. After the change, only one first floor guard stood duty and was responsible for all of the duties formerly performed by both guards, including checking a second First Union building next door at about 9:30 p.m. each night. Jenkins had been a fourth floor guard; after changing to Sizemore, Jenkins became a first floor guard. He was not pleased with the change because the Sizemore schedule interfered with his attending school while off duty.

On the night of January 4, 1988, Jenkins was on duty. At 9:30 p m. the silent alarm connected to First Union went off at the Augusta police department.[1] Because Officer Givens of the Augusta police department was around the corner, he arrived on the scene one to two minutes later. Upon his arrival, Jenkins met Officer Givens at the side door of the bank, which led into the main lobby. Jenkins told Givens that he was aware that the alarm had gone off and that he had contacted someone from the bank. Officer Givens and Jenkins checked around the bank building, but found nothing amiss. Later that night, Officer Givens received another silent alarm call from First Union. Upon his arrival at the bank the second time, Givens was met by Jenkins and a white male.[2]

On the same night, Joe White of the Mosler Company received a call from Jenkins concerning a false alarm at the bank. White monitored all reports of alarms and security systems problems for the bank. When White arrived at the bank between 10:00 and 10:15 p.m., he discovered that the after-hours depository vault was closed but not locked. The vault door opened in response to a single turn of the handle.[3] White called Ann Gilmore, the bank's teller supervisor, and asked her to come and lock the vault. When Gilmore arrived, she and White checked the vault and determined that some of the night deposits were missing. White and Gilmore searched the immediate area, but did not find the missing deposits that were in the bags. There was no evidence of tampering or forced entry.

---

1. The alarm is set off by opening the vault. It can be heard only at the Augusta Police Department; there is no way to detect the sounding of the alarm inside the bank.

2. The individual with Jenkins was Joe White, from Mosler Security Company.

3. Apparently White's opening of the vault set off the second silent alarm.

Gilmore locked the vault, but did not alert the police until the following morning.

In the morning, it was discovered that the following items were missing from the depository vault: $25,344.70 in cash, $8,498.99 in checks, and securities totalling a face amount of $101,741.64. The security log indicated that Linda Dunbar of the cleaning crew left the bank at 9:25 p.m., five minutes before the silent alarm sounded.

On January 22, 1988, officers searched Jenkins' residence in Hephzibah, Georgia pursuant to a search warrant. In the attic, officers found a tightly wrapped box containing Christmas decorations. In the bottom of the box were eight aluminum foil-wrapped bundles containing a total of $19,015.00 in cash. In the top drawer of the dresser in the Jenkins' master bedroom, officers found a Citizens and Southern National Bank deposit bag containing $300.00 and three letters from Barclays American Mortgage Corporation indicating that Jenkins was behind in his mortgage payments.[4] The officers also recovered ashes and burnt scraps of paper from the fireplace.

Forensic tests conducted on the money and the vault turned up negative for fingerprints. A number of the bills found in Jenkins' home contained writing allegedly made by the customers' employees as they were counting their receipts. Five employees of bank customers stated that writing on the bills could possibly be theirs, but they could not be sure. One employee of a customer positively identified a bill from a tear in the bill. Ink from pens gathered from the various customers was compared with the ink on the bills; an FBI lab employee found similarities between ink in two of the pens and that on six of the bills.

On May 5, 1988, Jenkins was indicted for bank larceny under 18 U.S.C.A. § 2113(b). On September 21, 1988, Jenkins filed a motion to suppress the fruits of the January 22 search on the grounds that the affidavits presented failed to establish probable cause for the search of the house

and that the search exceeded the scope of the warrant. A magistrate held a hearing on the suppression motion and, on October 5, 1988, issued a Report and Recommendation recommending that the motion be denied. On October 25, 1988 the district court adopted the magistrate's recommendation and denied the motion.

Trial began on November 15, 1988. During trial, Jenkins renewed his motion to suppress. He also took the stand in his own defense, claiming that the doors from the bank lobby to the main banking area had been left open the night of the theft. He maintained that the money found in the attic belonged to him, but did not explain its origin. Jenkins testified that a customer had come in about 6:45 that evening complaining that he could not open the night depository. Jenkins located a bank officer, who had Jenkins send the customer into the banking area. Jenkins stated that he spent the remainder of the evening checking the building. Jenkins was next door at the adjacent First Union building for five to six minutes during the evening. Jenkins stated that he became aware that the silent alarm had been activated when he came downstairs and discovered Officer Givens.

On November 18, 1988, the jury returned a verdict of guilty; ten days later, Jenkins filed a motion for a new trial based on his suppression argument. The court denied the motion on January 4, 1989. On March 30, 1989, the court sentenced Jenkins to twenty-seven months' incarceration, three years' supervised release, $6,029.70 restitution to First Union Bank, and a $50.00 special assessment.

On appeal, we consider four questions: (1) whether the district court erred in denying Jenkins' motions to suppress on the grounds of insufficiency of the affidavit and lack of probable cause; (2) whether the court erred in denying Jenkins' motion to suppress certain evidence allegedly obtained outside the scope of the warrant; (3) whether the court erred in commenting on the evidence prior to the jury charge; and

---

4. Later testimony indicated that Jenkins was in financial trouble, and that he had paid off a $2,200 mortgage arrearage after the January 4 theft.

(4) whether the court accurately computed Jenkins' sentence under the Federal Sentencing Guidelines.

## II. ANALYSIS

### A. *Sufficiency of the Affidavit and Probable Cause*

On January 20, 1988, FBI Agent Ann Todd applied for a warrant to search Jenkins' house. The affidavit accompanying the warrant application first recited the details of the theft. The affidavit then explained that Todd had interviewed the bank's cleaning staff and determined that none of them had been in the bank when the alarm was activated. The affidavit stated that the investigation had focused on Jenkins for four reasons:

1. Jenkins was the only person in the bank when the alarm sounded who had keys to the bank;

2. Jenkins was "bitter" at having his First Union employment terminated;

3. Jenkins told Officer Givens that he knew the alarm had sounded even though there was no indication of that within the bank; and

4. Jenkins was the only person with access to the night depository vault who refused to take a polygraph test.[5]

The affidavit also stated that Todd had spoken with a 17–year veteran FBI agent who had worked on bank robbery and burglary matters for ten of those years. The agent told Todd that people who steal money are most likely to take it to their homes for safekeeping. Finally, the affidavit recited the contents of the depository vaults as listed by the bank employees, including depository bags and envelopes of varying sizes and shapes, deposit tickets, checks, stock certificates, and currency. Based on this affidavit, the magistrate issued a warrant to search Jenkins' home.

Jenkins argues that the fruits of the search should have been suppressed because the affidavit failed to mention certain facts, the inclusion of which would have precluded a finding of probable cause for the issuance of a warrant. Jenkins alleges that the affidavit did not state: (1) that January 4 was Jenkins' first night as the only security guard, and that he had previously worked on the fourth floor; (2) that there were no specific instructions telling Jenkins how to perform what had previously been a two-man job by himself; (3) that Jenkins had never been convicted of a crime; (4) that the total contents of the depository vault weighed approximately 30 pounds and would have been very difficult to carry; (5) that upon activation of the alarm a perpetrator would have had less than a minute to conceal any stolen items; (6) that Jenkins, White, and Gilmore all searched the immediate area and found nothing; (7) that there were no specific instructions to lock the doors from the lobby to the bank while checking the building next door; (8) that previously the fourth floor guard had checked the building next door; (9) that Officer Givens had observed a truck with a white male in the driver's seat parked on the opposite side of the street from the bank on both his visits to the bank; (10) that if Jenkins had refused employment with Sizemore, he would have received a full month's pay plus two weeks' leave; (11) that Jenkins told Agent Todd that he first became aware that the alarm had gone off when Officer Givens arrived on the scene; and (12) that Jenkins had related to Agent Todd that earlier in the evening a customer had a problem with the night depository, and that a bank employee took the customer's deposit.

■■■ We will not overturn a district court's factual findings on a motion to suppress unless those findings are clearly erroneous. *United States v. Newbern,* 731 F.2d 744, 747 (11th Cir.1984). Similarly, we will not overturn a district court's decision that omissions or misrepresentations in a warrant affidavit were not reckless or intentional unless clearly erroneous. *United States v. Cancela,* 812 F.2d 1340, 1343 (11th Cir.1987). In the present case, the

**5.** None of the other employees actually took polygraph tests; they simply stated that they would be willing to do so.

district court's findings were not clearly erroneous.

In *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978), the Supreme Court held that affidavits supporting arrest warrants are presumptively valid. The Court stated:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. ... Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

Accordingly, "[i]nsignificant and immaterial misrepresentations or omissions will not invalidate a warrant." *United States v. Sims,* 845 F.2d 1564, 1571 (11th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 395, 102 L.Ed.2d 384 (1988) (quoting *United States v. Ofshe,* 817 F.2d 1508, 1513 (11th Cir.), *cert. denied,* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987)).

■ Thus, to be entitled to an evidentiary hearing on the allegedly omitted facts, Jenkins must prove (1) that Agent Todd knowingly or recklessly left out the facts Jenkins enumerates, and (2) that inclusion of the facts would have prevented a finding of probable cause. *See United States v. Sims,* 845 F.2d at 1571; *United States v. Kirk,* 781 F.2d 1498, 1502 (11th Cir.1986).

The magistrate who heard the motion to suppress found that the alleged omissions did not represent material misrepresentations or misstatements; this conclusion is not clearly erroneous. Jenkins has produced no "offers of proof" indicating that Agent Todd deliberately excluded the information referred to.

Inclusion of the allegedly omitted facts, moreover, would not have precluded the finding of probable cause. As the Supreme Court has noted, "probable cause is a fluid concept—turning on the assessment or probabilities in particular factual contexts—not readily or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). "[I]f the apparent facts set out in the affidavit are such that a reasonably discreet and prudent man would be led to believe that there was a commission of the offense charged, there is probable cause justifying the issuance of a warrant." *Dumbra v. United States,* 268 U.S. 435, 441, 45 S.Ct. 546, 549, 69 L.Ed. 1032 (1925). Even had the omitted facts been included, probable cause would have existed.

Jenkins argues that while there may have been probable cause to suspect that he committed the crime, the affidavit did not establish a nexus between the crime and his residence. Jenkins argues that the only evidence contained in the affidavit which connects the stolen goods to his home is the statement by the veteran FBI agent that people who commit bank thefts usually stash the contraband in their homes. Jenkins alleges that this statement is insufficient to constitute probable cause to search his home.

■ Probable cause to search a residence exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. "[T]he nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." *United States v. Lockett,* 674 F.2d 843, 846 (11th Cir.1982). "[E]vi-

dence that a defendant has stolen material which one normally would expect him to hide at his residence will support a search of his residence." *United States v. Maestas*, 546 F.2d 1177, 1180 (5th Cir.1977), *citing United States v. Lucarz*, 430 F.2d 1051 (9th Cir.1970); *United States v. Rahn*, 511 F.2d 290 (10th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975).

■ Under the circumstances in this case, the affidavit provided the magistrate issuing the search warrant with sufficient reason to believe that the contraband would be found at Jenkins' residence. As discussed above, the affidavit clearly established probable cause that Jenkins committed the theft; he was the only employee in the bank at the time of the theft who had keys to the bank,[6] and he knew that the silent alarm had sounded even though he could not have heard it. The affidavit stated that Agent Gerald L. Jones, the veteran FBI agent who advised Agent Todd about the likely hiding place of the contraband, had spent ten of his seventeen years with the FBI investigating bank robbery/burglary matters.[7] These combined facts would warrant a person of reasonable caution to believe that a search of Jenkins' home would uncover evidence of the theft.

This is not to say that the isolated word of an experienced FBI agent that people hide stolen items in their homes is sufficient to provide probable cause to search a residence. Nor does probable cause to believe that the defendant has stolen something justify search of a residence. We hold, however, that the combination of a finding of probable cause that Jenkins committed the theft, the fact that the contra-

band stolen was composed of items which are capable of being hidden in a residence, and the statement of an agent who had ten years' experience investigating bank robberies provided sufficient probable cause to justify a search of Jenkins' home.

### B. *The Scope of the Warrant*

During the search of Jenkins' residence, agents found a green C & S bag containing $300.00 cash and three letters from Jenkins' mortgage company. Agents found the bag in the top dresser drawer in Jenkins' master bedroom. Jenkins argues that the seizure of this bag exceeded the scope of the search warrant because, unlike the other items seized, the C & S bag was not described in the warrant. We disagree.

■ The Fourth Amendment requires that a warrant particularly describe the place to be searched and the items or persons to be seized; exploratory rummaging is prohibited. *United States v. Fannin*, 817 F.2d 1379, 1382 (9th Cir.1987). Only items described in the search warrant may be seized. *United States v. Bills*, 555 F.2d 1250, 1251 (5th Cir.1977); *United States v. Johnson*, 713 F.2d 654, 660 (11th Cir.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). An exception to this rule occurs "when in the course of performing a lawful search for an item listed on the warrant, the officers come across other articles of an incriminatory character...." *Johnson*, 713 F.2d at 660. In such a case, the property may be seized under the "plain view" doctrine. *Id.* To justify application of the plain view doctrine, the seizing officer must (1) have independent justification for being in a position

---

**6.** Agent Todd's affidavit states that the cleaning personnel departed the bank between 9:15 and 9:25 p.m. on the night of the theft. In the next sentence, the affidavit states that when the cleaning supervisor left the bank "at approximately 9:45 p.m.," there were no other employees in the building. Jenkins argues that because the affidavit states that the supervisor was in the building at 9:45 p.m., 15 minutes *after* the silent alarm sounded, the court did not have probable cause to suspect that Jenkins committed the theft. It appears that the 9:45 time in the second sentence is a typographical error. The preceding sentence states that all of the cleaning staff were out of the bank by 9:25, and the following sentence states that none of the clean-

ing staff was in the bank at the time the alarm sounded. Even if the cleaning supervisor had been in the bank at the time the alarm sounded, the other facts in the affidavit, such as the fact that Jenkins states that he knew the alarm had sounded and the fact that Jenkins was bitter about his change to Sizemore, are sufficient to provide probable cause to believe that Jenkins committed the theft. Jenkins' argument, therefore, is meritless.

**7.** Although the affidavit did not so state, Agent Jones assisted with the execution of the search warrant.

to see the items; (2) must discover the items inadvertently; and (3) must immediately observe that the items are evidence. *United States v. Blum*, 753 F.2d 999, 1002 (11th Cir.1985) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). The officers must have probable cause to believe the items are evidence of the crime. *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).

■ We conclude that the C & S bag and the letters were properly seized under the plain view doctrine. The warrant described numerous bank bags, stock certificates, checks, and bills. It listed the categories of documents and items sought. *See Fannin*, 817 F.2d at 1383. Due to the nature of the crime and the items taken, the officers had probable cause to believe that the C & S bag or papers inside the bag might have been stolen. It was certainly reasonable for the officers to search for such items in the drawers of the master bedroom; "a search may be as extensive as reasonably required to locate the items described in the warrant." *United States v. Wuagneux*, 683 F.2d 1343, 1352 (11th Cir. 1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). Similarly, because the officers were searching for small paper items such as bills and stock certificates, it was reasonable for them to look inside the C & S bag. Once the officers saw the Barclays letters, they realized that the letters were evidence of motive, and seized them for that purpose. The search did not exceed the scope of the warrant.

### C. *The Court's Comments to the Jury*

Before the district judge instructed the jury, he told them that he would "make some commentary on the evidence in the case." He told the jurors that they were not bound by his comments. He then reviewed the evidence, separating it into "hard" evidence and other evidence. He told the jury that they "might very well expect" that the Augusta police department's timekeeping abilities were in good shape and were accurate. The court stated that there was "definitely hard evidence"

that Jenkins was in the main bank building at the time of the robbery, but that there was other evidence about where he might have been. The court noted that Jenkins had denied stealing the money while under oath, and that his denial was consistent with his earlier statements. The court urged the jury to determine whether lack of security, appropriateness of the Sizemore security system, Jenkins' financial status, and the negligence of other bank employees were issues central to the case, or whether the more important issues were whether money was stolen and whether Jenkins had it. The court concluded the commentary by stating that "your consideration on matters of fact is to determine whether or not the government has proven, beyond reasonable doubt, that the defendant was the person who stole money, if any, from the possession of First Union Bank."

Jenkins argues that the judge's commentary suggested to the jury (1) that they should accept the testimony of the police officers; (2) that Jenkins was in the bank during the theft; and (3) that Jenkins should have had a satisfactory explanation for the money found in his attic. Jenkins argues that the commentary was prejudicial to him and played a part in his conviction. We disagree.

■ In *Quercia v. United States*, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933), the Supreme Court stated that a trial judge is not limited to giving abstract instructions. He may

> assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important; and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination.

*Id.* at 469, 53 S.Ct. at 699. This Court has held that a trial judge may comment on evidence "so long as he instructs the jury that it is the sole judge of the facts and that it is not bound by his comments...." *United States v. Hope*, 714 F.2d 1084, 1088 (11th Cir.1983). Of course such discretion

is not without limits; the judge may not distort or add to the evidence, and should make commentary only with great care. *Quercia*, 289 U.S. at 469, 53 S.Ct. at 699. The district court must be sure that its remarks do not prejudice the jury against the defendant; "[j]uries are extremely sensitive to every word and intimation given by the judge." *United States v. Cox*, 664 F.2d 257, 259 (11th Cir.1981); *see also United States v. Hope*, 714 F.2d at 1088.

 The trial judge's comments in Jenkins' case did not "stray from neutrality." *United States v. Bertram*, 805 F.2d 1524, 1529 (11th Cir.1986); *United States v. Harris*, 720 F.2d 1259, 1262 (11th Cir.1983). The judge informed the jury that they were responsible for finding facts and making credibility determinations. He told the jury that they were not bound by his comments. He told them that the police department kept accurate time, and that there was substantial evidence regarding Jenkins' whereabouts during the robbery. Finally, the judge pointed out to the jury that some of the evidence presented might be irrelevant and might serve to distract them from the task at hand. Nowhere did the judge tell the jury that Jenkins was guilty or that he had failed to make a showing on a particular point. Accordingly, the court did not abuse its discretion in making comments to the jury.

## D. *Sentencing Guidelines*

Section 2B1.1 of the Federal Sentencing Guidelines [8] outlines the sentences for various forms of larceny, embezzlement, and theft. The basic offense level for such a crime is four, and the level increases depending on the amount of property taken. The presentencing report computed Jenkins' sentence based on lost property totalling $135,585.33: $25,344.70 in cash,

$8,498.99 in checks, and $101,741.64, the total face value of the stolen securities. The presentencing report thus added an eight level increase based on this amount.[9] Section 2B1.1(b)(4) authorizes a two-level increase for offenses which involve more than minimal planning; the presentence report recommended this increase. The report concluded by recommending a total offense level of sixteen for Jenkins.[10] In Jenkins' case, this level results in a sentence of twenty-one to twenty-seven months. The court sentenced Jenkins to twenty-seven months, followed by three years of supervised release.

 Jenkins challenges his sentence on two grounds. First he argues that the sentencing court erred in calculating his sentence based on the face value of the stolen stock certificates. Second, he argues that the court erred in finding that his crime involved more than minimal planning. Both of these arguments appear to be based on the notion that the district court incorrectly applied the Guidelines to Jenkins' case. In determining whether Jenkins is correct, we must give due regard to the opportunity of the district court to judge the credibility of the witnesses, and we will not overturn the district court's findings of fact unless they are clearly erroneous. 18 U.S.C.A. § 3742(c).

 Regarding the first challenge, Jenkins argues that while the face value of the securities totalled $101,741.64, the securities were non-negotiable. Thus the face value did not equal the actual value lost. The replacement value of the stock—the cost of replacing the stock certificates— was only $1,017. Jenkins argues that the court should have computed his sentence using the $1,017 replacement value of the

**8.** Jenkins was sentenced under the Guidelines because he committed his crime after November 1, 1987. *See United States v. Burgess*, 858 F.2d 1512, 1514 (11th Cir.1988).

**9.** Jenkins' sentence was imposed under the pre-November 1, 1989 Guidelines. Had he been sentenced after November 1, 1989, his base level would have increased nine levels instead of eight.

**10.** The base offense level of four, plus the increase of eight levels due to the amount of money taken, plus the two-level increase for minimal planning, totaled 14. Jenkins also received a two-level increase under section 3B1.3 because his position of trust facilitated the commission of the crime; this raised the total offense level to 16.

stock rather than the $101,741.64 face value of the stock.

The government responds that the sentence should be calculated according to the victim's loss, which is represented by the value of the property taken. *See* section 2B1.1, Application Notes No. 2.[11] For example, the sentence imposed on one who steals a car is calculated based on the value of the car, even if the car is recovered immediately. In the case of a check or money order, the value is that amount that would have been lost had the check been cashed, even if the thief could not have cashed the check. *Id.* Thus, the government argues that Jenkins' sentence should be calculated based on the face value of the stocks, because that amount represents the value of the property stolen.

We agree with the government's argument. It is true that Jenkins would not have been able to obtain the face value of non-negotiable stocks or bonds; to him they would have been worthless. To those from whom they were stolen, however, the face value on the stocks determined how much interest they would receive and the value of their stock at the time of maturity. The fact that the stolen stock certificates may be cancelled and new certificates may be issued in their place does not change the value of the items stolen for sentencing purposes any more than recovery of a stolen car changes its value for sentencing purposes. Jenkins took from his victims securities that were worth $101,741.64 to those victims in some way and at some time. The district court correctly computed his sentence based on this amount.

With regard to the increase for more than minimal planning, Jenkins argues that he could not have planned the theft because the vault was left open by accident on the night of the crime. He argues that because he could not have known that the

vault would be open, he could not have planned how to rob it. The sentencing court found, however, that in order to move the stolen goods out of the bank as quickly as he did, Jenkins must have done some planning. This finding is not clearly erroneous.

## III. CONCLUSION

For the reasons stated above, we AFFIRM the district court's conviction and sentence of Eugene Jenkins.

---

**11.** The government stated at oral argument that the sentencing court should have defined loss as the replacement cost to the victim or the market value of the property, whichever is greater. This was the definition of loss contained in the Guidelines Application Notes up until the Notes were amended on June 15, 1988. At that time, the "replacement cost or market value" definition was deleted and the "value of property taken" definition was inserted in its place. Although the pre-June 15, 1988 definition of loss was in effect at the time of Jenkins' offense, this Court has held that we may properly consider the post-June 15, 1988 definition in determining his sentence. *United States v. Scroggins,* 880 F.2d 1204, 1215 (11th Cir.1989).