**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert H. BEARD, Defendant–Appellant.**

**No. 91–8012.**

United States Court of Appeals,
Eleventh Circuit.

May 18, 1992.

Michael Abbott, Atlanta, Ga., Richard E. Allen, Augusta, Ga., for defendant-appellant.

Richard H. Goolsby, Asst. U.S. Atty., Augusta, Ga., for plaintiff-appellee.

Before TJFOLAT, Chief Judge, BIRCH, Circuit Judge, and RONEY, Senior Circuit Judge.

RONEY, Senior Circuit Judge:

Robert Beard, a car dealer, was convicted of charges that were related to his activities concerning the taxation of rebates that he received from a company which installed radios in the cars his dealership sold: four counts of subscribing to false tax returns, conspiracy to obstruct justice, two obstruction of justice counts, and tampering with a witness. He challenges the district court's failure to group together the two obstruction of justice convictions under the Sentencing Guidelines, and the trial judge's comments during his charge to the jury. Contrary to Beard's argument, the two obstruction counts did not involve substantially the same harm, but rather involved significant additional criminal conduct which warrants separate grouping. The judge's comments did not amount to plain error in light of the evidence in the case and the jury instructions taken as a whole. We affirm.

The two obstruction of justice counts involved Beard's encouraging Stephen Dannerman and Charles Hauswirth to take responsibility for and concealing Beard's role in the rebate scheme. Beard was the owner of two car dealerships: Bob Beard Ford and Bob Beard Jeep–Eagle. Around 1982 Beard and Dannerman, Vice–President of Bob Beard Ford, entered into an agreement with Sound Electronics, Inc. to buy new car stereos, radios, and other automotive products rather than buying the products from the Ford Motor Company or the American Motors Company.

Sound Electronics agreed to charge the dealership an amount above the actual wholesale costs of the products sold to the dealership each month, and to rebate the overcharged amounts at the end of each month. Generally, in such "volume discount" practices the rebate checks are made payable to the dealerships. The parties, however, agreed that Sound Electronics should make the rebate checks payable to Dannerman. The same arrangement was made with Bob Beard Jeep–Eagle, but Sound Electronics agreed to make those checks payable to Hauswirth, the General Manager of Jeep–Eagle.

Sound Electronics mailed all of the rebate checks in the one envelope each month to the attention of Bob Beard, "personal and confidential." Beard would then give Dannerman and Hauswirth their checks, have them cash the checks, and return the proceeds to him. Beard then split the cash proceeds with them, keeping approximately 80–85% of their respective checks. He did not report this income on his income tax returns.

*Dannerman Obstruction*—When the Internal Revenue Service began investigating this rebate scheme, Beard instructed Dannerman to tell the IRS, if questioned, that he, and not Beard, received the rebate income. When Dannerman was charged with income tax evasion, Beard helped Dannerman obtain legal counsel, and agreed to pay all of his back taxes, penalties, interest, fines, and legal fees. In January 1988, Dannerman pled guilty to a charge of income tax evasion and was sentenced to a month in prison, fined $10,000, and ordered to pay back taxes, penalties, and interest owed. Beard paid approximately $56,000 for Dannerman's legal fees, taxes, and fines, as well as Dannerman's salary during his incarceration.

After his incarceration, Dannerman returned to work for Beard. Beard subsequently fired Dannerman, however, and re-

fused to make any other payments on his behalf. Dannerman then contacted the IRS and informed the Government for the first time about Beard's role in the rebate scheme.

*Hauswirth Obstruction*—Two years later, when the IRS served Hauswirth with a subpoena to appear before a grand jury, Hauswirth told Beard about the subpoena and Beard instructed him to do as Dannerman had done and lie about Beard's participation in the scheme. Hauswirth, however, decided not to protect Beard and entered into an immunity agreement with the Government. Pursuant to that agreement, Hauswirth made two undercover tape recordings with Beard, one before and one after his grand jury testimony. The initial tape indicates that Beard attempted to persuade Hauswirth to take full responsibility for receiving all of the rebate checks payable to Hauswirth, and that Beard advised Hauswirth to accept immunity from prosecution, if offered, and still lie about Beard's involvement. In the second conversation, when Hauswirth represented to Beard that he had not implicated Beard in the rebate scheme, Beard told Hauswirth that he had done exactly the right thing and that if he had told the truth, or said anything different, it would have jeopardized his income and insurance.

■ Beard contends that the district court erred in not grouping these two obstruction of justice counts for sentencing purposes. The United States Sentencing Commission Guidelines provide that when a defendant has been convicted of more than one count, the court should group all counts involving substantially the same harm into a single group. U.S.S.G. § 3D1.2.[1]

The Guidelines note that "[a] primary consideration in this section is whether the offenses involve different victims." U.S.S.G. § 3D1.2, comment. (backg'd). The

---

1. Section 3D1.2 provides in pertinent part:
   *Groups of Closely–Related Counts*
   All counts involving the same harm shall be grouped together in a single group. Counts involve substantially the same harm within the meaning of this rule:

   (a) When counts involve the same victim and the same act or transaction.
   (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan....

term "victim" is defined as the person "who is directly and most seriously affected by the offense and is therefore identifiable as the victim." U.S.S.G. § 3D1.2, comment. (n. 2). "For offenses in which there are no identifiable victims [the so-called victimless crimes in which society at large is the victim], the 'victim' for purposes of subsections (a) and (b) is the societal interest that is harmed." *Id.* This case involves a "victimless" crime, so the harm to the societal interest must be considered.

The defendant's conduct invades two distinct societal interests: the proper conduct of the district court and of the federal grand jury. His conduct with Dannerman involved a substantial interference with the district court because the court sentenced Dannerman without being apprised of Beard's participation in the rebate scheme. His conduct with Hauswirth, on the other hand, involved an attempt to convince Hauswirth to lie to the grand jury two years later.

■ Counts should not be grouped together where they "represent additional conduct that is not otherwise accounted for by the guidelines." U.S.S.G. Ch. 3 Pt. D intro. comment. The Hauswirth obstruction constitutes significant additional criminal conduct directed toward the grand jury which is sufficient to preclude grouping.

Subsection (d) specifies a set of offenses to which grouping applies, as well as offenses which are excluded from its operation. Beard's offenses do not fit into either category. In such situations, Subsection (d) provides for a case-by-case determination:

> For multiple counts of offenses that are not listed, grouping under this subsection may or may not be appropriate; a case-by-case determination must be made based upon the facts of the case and the applicable guidelines (including specific offense characteristics and other adjustments) used to determine the offense level.

U.S.S.G. § 3D1.2(d). Such a case-by-case determination has resulted in various decisions among the circuits. *See e.g., United States v. Gallo,* 927 F.2d 815, 823–24 (5th Cir.1991) (separate grouping for counts charging drug offenses and money laundering because distinct societal interests invaded); *United States v. Bruder,* 945 F.2d 167, 170–71 (7th Cir.1991) (offenses of being in possession of firearm and being in possession of same firearm which was unregistered should be grouped together); *United States v. Odofin,* 929 F.2d 56, 61 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 154, 116 L.Ed.2d 120 (1991) (separate grouping of heroin importation and false passport counts because they did not involve same harm); *United States v. Cain,* 881 F.2d 980, 982–83 (11th Cir.1989) (improper to group separately counts charging possession of three stolen checks from count charging retaining and concealing of same three checks).

The Government acknowledges that *United States v. Bradach,* 949 F.2d 1461 (7th Cir.1991), is strongly against its position. In *Bradach,* the defendant was convicted of subornation of perjury before a grand jury, conspiracy to commit subornation of perjury, and making false declarations under oath. The court held that the district court's single grouping of the offenses was proper, even if the harm to the United States was not the same for each false declaration. *Id.* The Government contends, however, that *United States v. Cousens,* 942 F.2d 800 (1st Cir.1991), and *United States v. Wessells,* 936 F.2d 165 (4th Cir.1991), should control.

In *Cousens,* the court upheld separate groupings of firearms violations where the defendant bought firearms on different occasions, for different purposes, and used funds from different sources. There was a two year gap between firearm purchases in two of the separately grouped counts. *Cousens,* 942 F.2d at 807.

■ In *Wessells,* twenty-two weapons counts were separated into three groups of closely related offenses for purposes of determining the defendant's base offense level rather than one single group. The court upheld the district court's finding that three independent courses of conduct were involved, stating that "[n]othing in Section 3D1.2 requires the court to group

offenses which it finds were committed under separate courses of conduct." *Wessells*, 936 F.2d at 169. As noted in both cases, the passage of time between offenses, differences in place of the offense, the nature of the offense, and the intervening circumstances taken together may justify separate grouping of the offenses. *Wessells*, 936 F.2d at 169; *Cousens*, 942 F.2d at 807.

In this case, the district court adopted the following reasons from the Addendum to the Presentence Report for grouping the offenses separately:

> The defendant was convicted of four guideline counts. Count 5 involved conspiracy to obstruct justice; and Counts 6 and 7, obstruction of justice; and Count 8, tampering with a witness. Count 6 is in reference to the obstruction involving the Steve Dannerman conviction on January 5, 1988. Counts 7 and 8 refer to the obstruction and tampering with a witness involving Charles Hauswirth which occurred on February 5, 1990. These convictions involved different men and are separated by over two years. Beard was convicted of getting Dannerman to take the blame in the January 5, 1988 conviction. Beard was convicted of attempting to get Hauswirth to lie to the Grand Jury. The probation office grouped Count 6 separately. The probation office grouped Counts 7 and 8 together because they involved the same victim (Charles Hauswirth) and substantially the same harm.
>
> The probation office would cite Application Note [8] under Section 3D1.2: "A defendant may be convicted of conspiring to commit several substantive offenses and also of committing one or more of the substantive offenses. In such cases, treat the conspiracy count as if it were several counts, each charging conspiracy to commit one of the substantive offenses. Then apply the ordinary grouping rules to determine the combined offense level based upon the substantive offenses of which the defendant is convicted and the various acts cited by the conspiracy count that would constitute behavior of a substantive nature."

██ Since we have found no cases in our Circuit that are factually similar to this case to guide the decision, and courts of appeals when reviewing a sentence under the Guidelines must give "due deference" to the district court's informed judgments, *see United States v. Howard*, 923 F.2d 1500, 1503 (11th Cir.1991); 18 U.S.C. § 3742(e) (1988), we conclude that a separate grouping was proper.

### Court's Comments To The Jury

██ Beard argues that the trial judge's personal feelings and comments were reflected in the jury instructions in such a manner that they prejudiced his case and warrant reversal. Since the defendant raises this issue for the first time on appeal, the case is reversible only for plain error. *United States v. Solomon*, 856 F.2d 1572, 1577 (11th Cir.1988), *cert. denied*, 489 U.S. 1070, 109 S.Ct. 1352, 103 L.Ed.2d 820 (1989); *United States v. Duncan*, 855 F.2d 1528, 1530 (11th Cir.1988), *cert. denied*, 489 U.S. 1029, 109 S.Ct. 1161, 103 L.Ed.2d 220 (1989); Fed.R.Crim.P. 52(b). A careful review of the jury instructions as a whole, does not establish plain error. *United States v. Solomon*, 686 F.2d 863, 875 (11th Cir.1982) (jury instructions must be taken in context as part of whole and interpreted with common sense).

The judge followed the Eleventh Circuit Pattern Jury Instructions in his charge to the jury, but on three occasions he departed from those instructions and improperly inserted what may be considered negative personal views.[2] He erroneously stated

---

**2.** The gravamen of the defendant's claim stems from the judge's following comments:

> I want to talk about the witnesses a good bit here. And as I begin to do so I will tell you, of course, you have to consider all of the evidence in the case. You have to consider all of the testimony in this case. That doesn't mean you have to accept all of the evidence and testimony as true or as accurate. *To put it as bluntly as I know how, there is no way you could accept all of the testimony in this case as true. Because you know, as well as I do; that someone is lying. It is your responsibility to figure out who that is.*

that the jury must figure out which witness was lying. The defendant asserts that based upon the judge's post-verdict comments, it is quite clear that the negative inferences were directed at Beard, and they prejudiced the jury.

■ It is well established law that a trial judge is not limited in giving abstract instructions, and may "assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence ... and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination." *Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933); *United States v. Jenkins*, 901 F.2d 1075, 1082 (11th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 259, 112 L.Ed.2d 216 (1990). Although the judge expressed a negative personal opinion of the defendant after the verdict was returned, his comments, to the jury, did not "stray from neutrality." *Jenkins*, 901 F.2d at 1083; *United States v. Bertram* 805 F.2d 1524, 1529 (11th Cir.1986). The judge properly instructed the jury that they were responsible for findings of fact and making credibility decisions. He did not tell the jury that Beard was guilty or untrustworthy. Beard primarily complains about the judge's post-trial comments expressing contempt for his activities and the supposed affect upon the jury. The jury was excused, however, when the judge openly expressed contempt for the defendant. Based on the entire instructions given, we conclude that no genuine prejudice can be shown and fundamental fairness was observed. *Solomon*, 856 F.2d at 1577–78.

AFFIRMED.

----

. . . .

As I have said the parties must take their witnesses as they find them. Sometimes only the people who themselves have taken part in a criminal activity have the knowledge that is required to show criminal behavior by *another*. For those very reasons the law provides for the admission of the testimony of persons such as the aforementioned.

. . . .

We are, in our daily affairs, continuously called upon to decide from the acts of others what another's intent is, and experience has taught us that frequently *actions speak more clearly than the spoken or the written word*. (Emphasis added).