[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15549
Non-Argument Calendar
_____

D.C. Docket No. 1:11-cr-00361-DHB-WLB-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARION STURGIS DONALDSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(March 12, 2014)

Before TJOFLAT, PRYOR and MARTIN, Circuit Judges.

PER CURIAM:

At the conclusion of a bench trial, Marion Sturgis Donaldson was convicted on two counts of a multi-count indictment[1]: Count One, conspiracy to distribute 5 kilograms or more of cocaine hydrochloride, 28 grams or more of cocaine base, and an amount of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 846; and Count Six, using a communication facility to facilitate the commission of a crime, in violation of 21 U.S.C. § 843(b).  The District Court sentenced Donaldson to concurrent prison terms of 169 months on Count One and 48 months on Count Six.  Donaldson now appeals his convictions and sentences.  He argues that his convictions should be set aside and a new trial granted on the ground that the District Court erred in denying his motion to suppress evidence—drugs and drug paraphernalia—seized by the police in a search of his residence.  He argues that his sentences should be vacated on the ground that the court erred in failing to reduce his total offense level for acceptance of responsibility under U.S.S.G. § 3E1.1.  We consider these arguments in order.

I.

---

[1] Donaldson and four others were charged in the Count One conspiracy: Dorsett Mandrell Williams, Timothy Dwight Gracy, Nicholas Phillip Washington, and Henry Michael Mims aka "Toast."

We start with a chronology of the events—as found by the District Court—that led to the search of Donaldson's residence.[2] We then address his motion to suppress, the District Court's adverse ruling, and his argument that the court erred.

A.

In March of 2011, officers with the Narcotics Division of the Richmond County [Georgia] Sheriff's Office, including Investigator Hester, commenced an investigation of Dorsett Mandrell Williams . . . based on their suspicion that he was involved in dealing narcotics. [A] confidential informant provided information that Williams was selling large amounts of cocaine; the informant also told the officers that Williams' cocaine operation involved the use of two houses located across the street from each other on Camille Street in Augusta, Georgia. Williams used one of the houses as a trap house, which Investigator Hester explained is a common slang term referring to a premises used to conduct narcotics transactions; the other house was used as a 'stash house,' which Investigator Hester explained is a similarly common term referring to a premises used to store money and narcotics. The officers conducted surveillance and determined that Williams did not live in either house; rather, the houses were used exclusively for their respective purposes in his drug dealing operation. The officers additionally arranged a number of controlled purchases of cocaine, the majority of which were carried out at the Camille Street houses. Based on the information obtained during the initial portion of their investigation, the investigating officers with the Richmond County Sheriff's Office, including Investigator Hester, requested and obtained authorization from a Richmond County Superior Court judge to intercept calls on several telephones belonging to Williams; the first such authorization was obtained on May 24, 2011.

The officers intercepted a number of calls between Williams and an individual later identified as Donaldson. During these calls, Williams

---

[2] The District Court's findings of fact are contained in the Report and Recommendation ("R & R") of the Magistrate Judge. The R & R recommended that Donaldson's motion be denied. The court adopted the R & R's findings of fact and its reasons for denying the motion to suppress.

and Donaldson engaged in discussions that the officers determined to be related to drug transactions. For example, in one call, Williams told Donaldson that he had '29 cent' for him. Investigator Hester testified that, based on his experience as a narcotics officer, he understood this to mean that Williams had $29,000.00 with which to purchase drugs. During the same call, Williams told Donaldson that he would be 'up top' and that the '29 cent' would be in the trunk of the Monte Carlo. Based on their observations of Williams' drug operation, the officers ascertained that this terminology referred to an arrangement for Donaldson to go to one of Williams' houses that be referred to as 'up top,' to pick up $29,000.00 from the trunk of Williams' automobile - a Chevrolet Monte Carlo - and to leave cocaine in its place.  Following the call, officers verified that the Monte Carlo was parked in the location indicated.  In another call intercepted on June 10, 2011, Williams asked Donaldson if he was still 'holding up,' to which Donaldson replied that he was; Williams then again said that he would be 'up top,' and he told Donaldson that he wanted 'the half.' Investigator Hester decoded this conversation, explaining that Williams asked Donaldson if he had any cocaine, Donaldson said he did, and Williams indicated for Donaldson to deliver half a kilogram of cocaine.  The officers then observed an individual in a vehicle registered to Donaldson arrive at Williams' house referred to as up top' and leave after a few minutes.

On June 16, 2011, officers intercepted another call, in which Williams and Donaldson discussed the June 8, 2011 drug-related arrest of Timothy Gracy . . . as well as the fact that their cocaine business had been slow of late.  By this point, Investigator Hester and the other investigating officers had determined that Donaldson was Williams' drug supplier, and on June 26, 2011, they obtained authorization from a Richmond County Superior Court judge to intercept calls on Donaldson's cellular telephone, as well as authority to 'ping' the phone to determine its location.  Investigator Hester and another officer also observed a transaction between Donaldson and Williams on June 26th.  Specifically, they observed Donaldson pull up near Williams' houses on Camille Street; Williams entered the "stash house" and came out carrying a white bag, which he handed to Donaldson.  The transaction lasted only a few minutes, and Donaldson drove away without ever exiting his car.  Following the meeting, the officers 'pinged' Donaldson's phone and determined its location to be 180 Oakland Drive, North Augusta, South Carolina. Officers

4

confirmed that this was Donaldson's residence by observing him there and by verifying that a vehicle at the house was registered to Donaldson; in addition, officers were again able to locate Donaldson's cell phone at the residence via 'ping' tracking on June 27 and 28, 2011.

On June 27, 2011, officers intercepted a call on Donaldson's phone in which he talked with an individual identified only as 'Big.' Donaldson and Big discussed an upcoming drug transaction, and Donaldson said at one point that he 'might be alright' until the weekend, meaning that he had enough cocaine for the time being; they also referred to 'counts' during the call, and Big asked Donaldson 'what he wanted,' to which Donaldson responded 'a set of tires.' Based on his training, experience, and knowledge of the investigation, Investigator Hester stated that he knew that 'counts' referred to money and 'tires' referred to kilograms of cocaine, with a 'set' representing four kilograms. Officers intercepted additional calls and surveilled Donaldson during the next two days; one call made reference to a 'nine ounce deal,' and he engaged in two brief transactions that Investigator Hester characterized as indicative of drug-related activity.

On June 28, 2011, one of the Richmond County officers involved in the investigation contacted Detective Philip Turner of the North Augusta Department of Public Safety for assistance in obtaining a warrant to search Donaldson's residence at 180 Oakland Drive. Detective Turner was provided with a written summary of the findings of the investigation, which he went over with the Richmond County officer [Investigator P.J. Hamrick] who provided it to him. The written summary of the investigation discusses the previously mentioned intercepted calls and surveillance; it specifically refers to the June 27th phone call, as well as Williams' 'trap house' on Camille Street and the June 26th exchange between Williams and Donaldson at the Camille Street location. The summary also discusses the officers' information that Donaldson resided at 180 Oakland Drive in North Augusta, including their tracking of his cell phone, observation of him at the residence, and verification that a vehicle at the residence was registered in his name. Based on this information, Detective Turner drafted a search warrant and accompanying affidavit. The affidavit states, in pertinent part:

> I, Phillip M. Turner, being duly sworn, depose and say: I am a police officer, certified in South Carolina. The

North Augusta Department of Public Safety has employed me for over 9 years, the last 5 years as a Narcotics Detective. I have investigated hundreds of cases involving controlled substances. I have attended over one hundred hours of specialized training in the field of Narcotics detection, identification, concealment, searches, seizures, and undercover operations. I have been certified as an expert in the field of Narcotics Investigation in the second judicial circuit of South Carolina. . . . Through the use of multiple investigative means and techniques it has been established that within the past seventy-two hours, Donaldson was in possession of a quantity of Cocaine and was in the process of acquiring more Cocaine. Through further investigative techniques it has been discovered that Donaldson is living at 180 Oakland Drive, North Augusta, South Carolina. Reviewing the City of North Augusta Water files it has been discovered that the account is in Donaldson's name. Upon conducting physical surveillance at the residence, a [vehicle] is parked at the residence and does come back [as registered] to Donaldson.  Through using proven investigative tools and measures, it has been established that Donaldson has been present for extended periods of time at the residence in question.  Upon my training and experience, I believe that probable cause exists that Cocaine and items associated with the distribution or ingestion of Cocaine are present on the property of 180 Oakland Drive, North Augusta, South Carolina.

   Later the same day, Detective Turner met with the Honorable Roger Edmonds, then-Chief Magistrate Judge of Aiken County, South Carolina, to apply for a search warrant.  Detective Turner testified that he went over the warrant and accompanying affidavit with Judge Edmonds. Detective Turner further testified that he provided sworn, oral testimony to Judge Edmonds in which he explained the entire content of the written summary that he had been provided by the Richmond County officers.  Detective Turner stated that his oral testimony was not recorded, which is not unusual in the South

6

Carolina warrant application process.  Judge Edmonds signed the search warrant on the same date it was presented - June 28, 2011.

On June 29 and 30, 2011, officers intercepted additional calls between Donaldson and Big in which they continued to discuss an upcoming drug deal; eventually, Donaldson told Big that he would meet him the morning of July 1, 2011.  Big called Donaldson again around 9:14 a.m. on July 1st.  During that call, they confirmed that they were going ahead with the deal, and Big asked if they were still on the same 'channel,' to which Donaldson responded that he needed to go 'down one channel.'  Investigator Hester interpreted this to mean that instead of buying four kilograms of cocaine, as initially planned, he would instead purchase three kilograms.  In another call later that morning, Big said he would be at the 'warehouse,' and Donaldson said that he was on the way.

Investigator Hester and other officers followed Donaldson, as they did not know the location of the warehouse.  After pursuing Donaldson westbound on Interstate 20 for a significant  distance, they determined  that  he  was  likely  headed  into  Atlanta. Because they did not want to risk losing track of Donaldson's vehicle in heavy traffic, the officers decided to stop Donaldson before he reached Atlanta.  As the Richmond County officers were in civilian clothing and unmarked vehicles, they contacted officers with the Georgia State Patrol and requested assistance in making the stop. . . .

Trooper Johnson, along with another uniformed officer from the Georgia State Patrol, stopped Donaldson's vehicle on Interstate 20 before it reached Atlanta.  Investigator Hester and the other Richmond County officers . . . arrived almost  immediately at the scene of the stop.  Trooper Johnson approached  the  vehicle, asked Donaldson for his license and proof of insurance, and directed him to exit the vehicle.  After Donaldson stepped out of his vehicle, Investigator Hester asked Deputy Reynolds [who had appeared with a K-9 dog] to have her canine perform an open air "sniff' around the vehicle.  Deputy Reynolds walked her canine around the outside of the vehicle, and the canine signaled that she detected the odor of narcotics coming from the vehicle.  Deputy Reynolds informed the Richmond County officers of the positive alert for an odor of narcotics.   At that point, Investigator Hester and another Richmond County officer searched Donaldson's vehicle. Within a matter seconds, they found a bag containing $82,025.00 in cash under the

7

back seat of the vehicle.  After finding the money, Donaldson was taken to a nearby rest stop, where he was interviewed by agents with the Richmond County District Attorney Task Force. During that interview, Donaldson stated that had been traveling to Atlanta to purchase three kilograms of cocaine with the money found in his vehicle.

Around the same time as the traffic stop, officers in North Augusta executed the search warrant on Donaldson's residence at 180 Oakland Drive.  The search of Donaldson's residence uncovered *736.5* grains of cocaine, 124.9 grams of crack, 221.9 grains of marijuana, over $57,000.00 in cash, a .40 caliber handgun, and a Rolex watch.

B.

In his pretrial motion to suppress the evidence found in his residence, Donaldson argued that the search warrant for his home was not supported by probable cause.  The District Court concluded that Detective Turner's affidavit established probable cause that drugs would be found in Donaldson's residence and therefore denied his motion.  At trial, Donaldson renewed his motion to suppress.  The District Court denied it and found him guilty on Counts One and Six of the indictment.  On appeal, Donaldson argues that the court erred in denying his motion because Turner's affidavit and oral testimony before Judge Edmond did not establish probable cause that drugs would be found in his residence.

C.

The District Court's denial of the motion to suppress presents a mixed question of law and fact.  We review the findings of fact underpinning the ruling

8

for clear error and the court's application of law to those facts *de novo*. *United States v. Bautista-Silva*, 567 F.3d 1266, 1271 (11th Cir. 2009).

The Fourth Amendment establishes the right to be free from unreasonable searches and seizures, and mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The task of the judge issuing a warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of the persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (quotation omitted). In South Carolina, oral testimony may also be used to supplement a search warrant affidavit which is facially insufficient to establish probable cause. *See State v. Weston*, 329 S.C. 287, 494 S.E.2d 801 (1997).[3]

---

[3] "The Fourth Amendment does not require that the basis for probable cause be established in a written affidavit; it merely requires that the information provided the issuing magistrate be supported by 'Oath or affirmation.'" *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994) (quoting U.S. Const. amend. IV). The Fourth Amendment likewise does not require "that statements made under oath in support of probable cause be tape-recorded or otherwise placed on the record or made part of the affidavit." *Id.* (quoting *United States v. Shields*, 978 F.2d 943,946(6th Cir. 1992)). Therefore, "a federal court... may consider an affiant's oral testimony, extrinsic to the written affidavit, which is sworn before the issuing magistrate, in determining whether the warrant was founded on probable cause." *United States v. Hill*, 500 F.2d 315, 320 (5th Cir. 1974)12; *accord Clyburn*, 24 F.3d at 617 ("[M]agistrates may consider sworn, unrecorded oral testimony in making probable cause determinations during warrant proceedings."); *Frazier v. Roberts*, 441 F.2d 1224,1226 (8th Cir. 1971) ("It is clear that the Fourth Amendment permits the warrant-issuing magistrate to consider sworn oral testimony

The affidavit, and in this case the affidavit augmented by Detective Turner's sworn testimony, should connect the place to be searched with the defendant and the criminal activity. *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002).

> The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime.

*United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009). Moreover, an allegation that illegal activity occurred at the place to be searched, such as the home, is not necessary, but the affidavit (coupled with the sworn testimony in this case) should link the defendant to the home and connect the home to any criminal activity. *Id.* In establishing the link to criminal activity, it is not necessary that the home be the "locus" of criminal activity. *United States v. Bradley*, 644 F.3d 1213, 1264 (11th Cir. 2011). "Evidence that the defendant is in possession of contraband that is of the type that would normally expect to be hidden at [his] residence will support a search." *United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008); *see also United States v. Jenkins*, 901 F.2d 1075, 1080-81 (11th Cir. 1990)

---

supplementing a duly executed affidavit to determine whether there is probable cause upon which to issue a search warrant.")

(holding that the affidavit was supported by probable cause because of the combination of the defendant's theft, the fact that the contraband was capable of being hidden in the home, and the statement of an experienced FBI agent that individuals who steal money often hide it in their homes).

In *United States v. Lockett*, we held that a search warrant affidavit for dynamite that was believed to be improperly stored at the defendant's residence was not supported by probable cause, where the affidavit lacked any facts or circumstances that would lead to a reasonable belief that dynamite was stored inside the residence.  674 F.2d 843, 845-47 (11th Cir. 1982).  The affidavit provided to the magistrate stated that: (1) the defendant had bought a case of dynamite; (2) two weeks later, a bomb made from the same type of dynamite was found 60 miles from the defendant's home in one of the defendant's former employer's buildings; (3) the defendant was a disgruntled former employee who had made implied threats against his former employer; and (4) investigators did not observe any appropriate dynamite storage facilities on the defendant's property. *Id.* at 846.  We concluded that there were no facts in the affidavit from which the magistrate could reasonably infer that dynamite would be located on the defendant's property.  *Id.* at 847.

The District Court properly found that the search warrant affidavit and Turner's sworn oral testimony established probable cause that drug-related

evidence would be found at Donaldson's residence.  The District Court credited both Turner's testimony that he provided sworn oral testimony regarding the sensitive investigative techniques used by the Richmond County Sheriff's Office and Judge Edmonds's testimony that he was familiar with Investigator Hamrick's summary of the investigation and that he often took sworn oral testimony to supplement search warrant affidavits.  These credibility findings are entitled to deference.  *See United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002).

The evidence before Judge Edmonds showed that within a three day period, Donaldson spoke on the phone with Dorsett Mandrell Williams, a known drug dealer, shortly thereafter made an exchange with Williams at a location known to investigators as Williams's stash house, and spoke with an individual identified as "Big" using code words to discuss the purchase of a large quantity of cocaine. During this time frame, ping records showed that Donaldson or his cell phone was at his North Augusta residence within hours after his call to Big and also after the observed exchange with Williams.  Based on this evidence, the District Court did not clearly err in finding that Turner's statement in the search warrant application—that Donaldson had possessed cocaine in the last 72 hours and was in the process of acquiring more cocaine—was not false or reckless.

To establish probable cause, Judge Edmonds was permitted to rely upon Turner's statement in his affidavit that, based on his training and experience, which included five years as a narcotics detective, he believed that cocaine or other items associated with the distribution of cocaine would be present at Donaldson's residence. *See United States v. Joseph*, 709 F.3d 1082, 1100 (11th Cir.), *petition for cert. filed*, (U.S. Jul. 10, 2013) (No. 13-5319) (stating that a police officer's expectation based on his training and experience that evidence will likely be found in the place to be searched can establish probable cause). Under the totality of the circumstances, Judge Edmonds made a common-sense determination that a fair probability existed that drug-related evidence would be found at the North Augusta residence. *See Gates*, 462 U.S. at 238, 103 S.Ct. at 2332.

Contrary to Donaldson's argument, there was evidence connecting his residence with criminal activity. It was not necessary that the residence be the "locus" of criminal activity. *See Bradley*, 644 F.3d at 1264. Ping results and surveillance showed that Donaldson spent a lot of time there during the time period in which he conducted the exchange with Williams at Williams's stash house and spoke with Big in code language about purchasing four kilograms of cocaine. Although Donaldson cites to *Lockett*, the instant case is distinguishable because Turner's sworn oral testimony provided the facts necessary for Judge Edmonds to reasonably infer that drugs would be found at the residence. *See Lockett*, 674 F.2d

13

at 845-47.  Unlike in *Lockett*, the evidence here established that the residence was, in fact, Donaldson's residence and that he was there during the time in which he was engaging in drug-related activity.  Moreover, *Lockett* involved a discrete purchase two weeks before the search warrant was executed; in this case, however, Donaldson was in an ongoing drug transaction at the time when ping records showed him or his cell phone at his residence.  In sum, the District Court did not err in concluding that the issuance of the search warrant was supported by probable cause.[4]  *See Gates*, 462 U.S. at 238, 103 S.Ct. at 2332.

## II.

We review for clear error the District Court's determination regarding a reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1.  *United States v. Moriarty*, 429 F.3d 1012, 1022-23 (11th Cir. 2005).  Because the court's decision regarding a defendant's acceptance of responsibility is entitled to great deference, we will not set aside the court's denial of a § 3E1.1  reduction for acceptance of responsibility unless the record clearly establishes that the defendant accepted responsibility.  *Id.*  "The defendant bears the burden of clearly

---

[4]  The facts stated in the R & R, which the District Court adopted, included events that occurred after Turner applied to Judge Edmonds and he issued the search warrant.  Those facts—which included Donaldson's admission to the agents with the Richmond County District Attorney Task Force following his arrests on July 1, 2011, that the $82,000 found in his vehicle was for the purchase of three kilograms of cocaine—were not considered by the District Court in ruling on Donaldson's motion to suppress.  Nor are they considered by this court in reviewing the District Court's ruling.  Those facts are relevant, though, because they bear on the question of Donaldson's guilt and his acceptance of responsibility under U.S.S.G. § 3E1.1, which we address in Part II, *infra*.

demonstrating acceptance of responsibility and must present more than just a guilty plea." *Id.* at 1023 (quotation omitted).

Pursuant to § 3E1.1(a), a defendant is entitled to a two-level reduction in his offense level if he clearly demonstrates acceptance of responsibility. U.S.S.G § 3E1.1(a). The commentary to § 3E1.1 states that:

> In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:
>
> (A) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct) . . . . However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility[.]

U.S.S.G. § 3E1.1, comment. (n.1(A)). The reduction for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *Id.*, comment. (n.2). However, a defendant who is convicted at trial is not automatically precluded from a reduction. *Id.* "In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." *Id.* This may occur when a defendant goes to trial

15

"to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct." *Id.*

A district court may also deny a reduction for acceptance of responsibility based on a defendant's conduct, even if that conduct involves asserting a constitutional right. *United States v. Smith*, 127 F.3d 987, 989 (11th Cir. 1997) (*en banc*). We have held that a defendant who challenged the admissibility of the evidence necessary to support his conviction was not entitled to a reduction for acceptance of responsibility. *United States v. Gonzalez*, 70 F.3d 1236, 1239 (11th Cir. 1995); *see also United States v. Knight*, 562 F.3d 1314, 1328 (11th Cir. 2009) (holding that a defendant was not entitled to an adjustment for acceptance of responsibility when he pled guilty on the eve of trial, only after he had unsuccessfully moved to suppress the evidence against him). In *Gonzalez*, the defendant challenged the dispositive evidence against him in a four-day suppression hearing and did not plead guilty, but instead required the court to expend resources on a bench trial. 70 F.3d at 1239-40. We stated that by challenging the essential evidence against him, Gonzalez tried to avoid a determination of factual guilt and thereby escape responsibility for his crime. *Id.* at 1239. Thus, we held that the District Court did not clearly err by considering Gonzalez's efforts to fight the evidence against him and his failure to plead guilty in denying the reduction, pursuant to § 3E1.1. *Id.* at 1240.

In this case, the District Court did not clearly err in denying Donaldson a reduction for acceptance of responsibility. The court's finding that Donaldson was not entitled to the reduction is entitled to great deference, and Donaldson has not met his burden of clearly demonstrating that he accepted responsibility for his crimes. *Moriarty*, 429 F.3d at 1022-23. Although Donaldson waived his right to a jury trial, he put the Government to its burden of proof at the bench trial. *See* U.S.S.G. § 3E1.1, comment. (n.2). An an acceptance of responsibility reduction may be denied even where the defendant is asserting a constitutional right. *See Smith*, 127 F.3d at 989.

While there are rare situations where a defendant may show an acceptance of responsibility despite exercising his right to trial, Donaldson has not done so here. *See* U.S.S.G. § 3E1.1, comment. (n.2). This case is not like the rare situations listed as examples in the commentary to § 3E1.1. *See* U.S.S.G. § 3E1.1, comment (n.2). Donaldson did not admit all the facts the Government sought to prove, but rather required the Government to come forward and prove them. As in *Gonzalez*, Donaldson was trying to avoid a finding of factual guilt. *See Gonzalez*, 70 F.3d at 1239. Furthermore, if he had succeeded on his motion to suppress it would not have resulted in acquittal; instead, it would have simply put the Government to the task of trying to prove his guilt with other evidence—by

providing Williams's testimony, as the Government in fact did at Donaldson's trial.

Donaldson also argues that he proceeded to trial because the Government's plea offer contained a waiver of his right to appeal issues concerning the application of the Sentencing Guidelines. There was no evidence presented to the District Court, only counsel's arguments, as to the plea negotiations between Donaldson and the Government. In any event, Donaldson's argument, even if true, is unavailing. First, there is no constitutional right to appeal. *See United States v. Bushert*, 997 F.2d 1343, 1347 (11th Cir. 1993). Second, even if Donaldson went to trial because the plea agreement offered by the Government would have waived his right to challenge the application of the Guidelines, this did not show that the District Court clearly erred in finding that he did not clearly demonstrate acceptance of responsibility, especially in light of his putting the Government to its burden of proof at trial. In sum, because Donaldson has not clearly shown that he accepted responsibility, the District Court did not clearly err in denying the § 3E1.1 reduction.

Donaldson's convictions and sentences are

AFFIRMED.