966 F.2d 1446
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Albert Larry WEAVER, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Kevin Tyrone BALDWIN, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Kendal TAYLOR, Defendant-Appellant.
 Nos. 90-5118, 90-5119, 90-5120.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 6, 1992
Decided: June 22, 1992
 
 ARGUED: Mark John Rochon, Jr., KOHLMAN & ROCHON, Washington, D.C., for Appellant Weaver; Bertram Kalisch, III, McLean, Virginia, for Appellant Baldwin. Vincent L. Gambale, UNITED STATES ATTORNEY'S OFFICE, Alexandria, Virginia, for Appellee. ON BRIEF: Carolyn Currie Eaglin, BROWN, BROWN & WATKINS, Alexandria, Virginia, for Appellant Taylor. Richard Cullen, United States Attorney, W. Neil Hammerstrom, Jr., Assistant United States Attorney, Emmett L. Fleming, Jr., Special Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 Before ERVIN, Chief Judge, NIEMEYER, Circuit Judge, and MURRAY, Senior United States District Judge for the District of Maryland, sitting by designation.
 NIEMEYER, Circuit Judge:
 
 
 1
 As a result of the robbery of a Brinks armored car at Dulles International Airport in Northern Virginia, a jury convicted Kevin Tyrone Baldwin and Kendal Taylor of conspiring to commit robbery of articles in commerce in violation of 18 U.S.C. § 1951; robbery of articles in commerce in violation of 18 U.S.C. §§ 1951 and 1952; and the use of a firearm in the commission of a violent crime, in violation of 18 U.S.C. § 924(c)(2). In the same proceeding, the jury convicted Albert Larry Weaver, Jr., for his participation in the conspiracy, in violation of 18 U.S.C. § 1951, although the jury was unable to reach a decision on the robbery and firearm charges against him. Having carefully considered the various arguments of defendants raised on appeal, we affirm.
 
 
 2
 * In the early morning hours of May 30, 1990, four or five black men robbed a Brinks armored car while on its morning run to Dulles International Airport. As two guards loaded the valuables onto the armored car at the Federal Express depot at the airport, they were struck from behind. The robbers threw one guard to the floor of the truck and pushed the other into a corner. At least two of the assailants arrived armed with handguns, and the robbers also took from the guards their service revolvers. Of the ten bags the guards were loading at the time of the attack, the robbers took two and fled in a van, later identified as a 1989 Dodge Ram Van. Among the stolen property was foreign currency valued at more than $161,000, jewelry worth over $222,000 and three non-negotiable promissory notes, each with a face value of $1 million.
 
 
 3
 A witness that morning saw five black men run across Route 28 and jump a fence into a restricted area at Dulles Airport. Several minutes after the robbery, another witness who was heading to work in the vicinity of Dulles Airport observed a Dodge Ram Van, being driven by a black man, speed through a red light and head down a side road, where the van broke through a chain crossing the road. The witness reported that the van was still there at the end of the day, but the next morning it had been turned around and looked as if it had become stuck.
 
 
 4
 At about 7 p.m. on the day of the robbery, a Trans World Airlines (TWA) employee was leaving work when he encountered a black man, later identified as defendant Kevin Tyrone Baldwin, hitchhiking in a restricted area of the airport. The driver stopped to offer Baldwin a ride and noticed Baldwin was wearing no shoes. Baldwin stated that he had been robbed of his pants and sneakers but had borrowed some pants and money from a house near the airport. The TWA employee then took Baldwin to a guard at a security gate where, in response to questioning, Baldwin lied about his identity, address, and social security number. Baldwin repeated the story about his being robbed but was unable to describe the robbers or locate the house where he claimed to have borrowed the pants. Baldwin was charged with trespassing and released on a summons.
 
 
 5
 On May 31, 1990, one day after the robbery, Baldwin gave his girlfriend, Seletheia Moore, a diamond and ruby ring with the inscription "T & Company" and the number "750" inside. When Baldwin refused to tell her where he got the ring and rejected her proposal to get it appraised, she became suspicious and returned the ring to him. Moore later identified the ring as that pictured in a Tiffany & Company catalog and listed as shipped and loaded onto the Brinks truck but never delivered to its intended destination.
 
 
 6
 Several days after the robbery, defendant Kendal Taylor gave Brenda Wade an 18-carat gold ring, which contained a large cultured pearl. The ring was intended to be a gift to Wade's daughter. Wade later turned the ring over to the Federal Bureau of Investigation (FBI) and the ring was produced at trial where it was identified as a "one of a kind" item of jewelry that was among those stolen in the Brinks heist.
 
 
 7
 On June 1, 1990, when searching the area, the police recovered the abandoned Dodge van from the place in which it had become stuck. When found, the van was in a ditch and had a piece of electrical cable tied to the front suspension. Apparently, the cable had snapped during an attempt to pull the van from the ditch. Four latent fingerprints and four latent palm prints, belonging to Kendal Taylor, were lifted from the van. Taylor's left palm print was also discovered by investigators on the Brinks armored car. The van, which was identified at trial by one of the Brinks guards as the vehicle used by the robbers, was registered to Benny Baldwin, Kevin Baldwin's father. Kevin Baldwin was known to have possession of the keys several days before the robbery and, on June 1, 1990, two days after the robbery, the van was reported stolen. In the search around the immobilized get-away van, federal agents also found, lying some distance apart, matching size 10 tennis shoes. The FBI made plaster casts of the shoe imprints found in the vicinity of the van.
 
 
 8
 The FBI came to suspect that the robbery was committed by members of a gang from the area of 5th and "O" Streets in Northwest Washington, D.C., an area in which all of the defendants reside. One of the guards who had been struck on the head by the robbers, identified Albert Larry Weaver, Jr., as the robber who hit him, after observing several photo arrays consisting of six pictures each. The other guard identified Rudolf Williams as the robber who took his weapon.
 
 
 9
 On August 7, 1990, a federal grand jury issued a three count indictment charging Baldwin, Taylor, Weaver, and Williams with conspiring to commit robbery, robbery, and use of a handgun in the commission of a robbery. The defendants were tried together, beginning on September 25, 1991. As part of their defenses, Weaver, Baldwin and Taylor each produced at least one alibi witness. After a four day trial by jury, Baldwin and Taylor were convicted on all three counts. Weaver was convicted only on the conspiracy count, the jury being deadlocked on the other two. The jury was deadlocked on all three counts as to Williams, who is, therefore, not a party to this appeal.
 
 II
 
 10
 As their first basis for appeal, all three defendants argue they were denied their right to a trial by an impartial jury. The complaint of error is based upon a note sent to the district court by a member of the jury during deliberations on September 28, 1991, stating:
 
 
 11
 Your Honor, please provide me with a copy of the information which was given the defense attorneys. Terry Tipple and Laura Connor, fellow jurors, told me that they had seen the defendants reading private information about the jurors from the list furnished to the defense attorneys. They feel intimidated by the defendants possession of this information.
 
 Respectfully, Aurelia S. Howatt
 
 12
 The defendants moved for a mistrial and the court denied the motion. The court also decided not to conduct an individual voir dire examination of each member of the jury.
 
 
 13
 Instead, the district court explained to the jury, as a whole, the nature of the jury list and, further, that the list would be put under seal so that none of the defendants could continue to look at it. The court told the jurors:
 
 
 14
 There is no reason, absolutely none, for any of you to fear any intimidation on anybody's part from any source. I've been here for eight years, we have never had a problem during the whole time I've been here with that situation.
 
 
 15
 The court then gave another instruction regarding the jury's duty to decide the case based on the evidence and in accordance with the instructions it had received. The instruction concluded:
 
 
 16
 If you feel intimidated, let me know that you do feel intimidated, and I will take care of that, but there isn't absolutely any reason for any juror to have any fear in this case.... If you can decide the case taking out any question you may feel of any personal intimidation, please decide the case. If you have any problem with intimidation, then let me know.
 
 
 17
 No member of the jury responded and the jury returned its verdict the same day.
 
 
 18
 While it is true that the Sixth Amendment provides to each criminal defendant a right to a trial by an impartial jury, Reynolds v. United States, 98 U.S. (8 Otto.) 145, 154 (1879), it is also well established that "[a] trial court's findings of juror impartiality may 'be overturned only for manifest error.' " Mu'min v. Virginia, 111 S.Ct. 1899, 1907 (1991) (quoting Patton v. Yount, 467 U.S. 1025, 1031 (1984)). Furthermore, "the decision to conduct further voir dire, or to strike [potentially impartial jurors] from the panel rests with the sound discretion of the trial court." United States v. Grandison, 783 F.2d 1152, 1155 (4th Cir.), cert. denied, 479 U.S. 845 (1986).
 
 
 19
 In Grandison, on the first day of trial the jury foreman sent the trial judge a note, expressing the fact that one of the jurors, an expectant mother, worked in the same area in which "some of the people involved in this case lived." Grandison, 783 F.2d at 1155. The note continued, "She is becoming concerned about what might happen after this trial is over." Id. The contents of the note did not come to the attention of the litigants until the close of trial, five days later. The court asked the jurors "if any of them were unable to begin their deliberations and conclude their deliberations in this case." Id. When none of the jurors responded, the court denied the motions of both the defendants and the government to strike the foreman and the other juror in question. On appeal, we stated, "Because the jury did not indicate to the judge an inability to proceed to render a fair and impartial verdict, we find no abuse of discretion in this case." Id.
 
 
 20
 If anything, the facts in Grandison present a more difficult question than do those here. In this case, the district court promptly addressed the concerns of several jurors. The court removed the primary source of the potential fear by explaining to the jury the nature of the jury list and its common use by defendants and their attorneys. Further, the judge enjoined the attorneys from giving the list to their clients and placed the list under seal "so that nobody else can get it." Moreover, the jurors were asked to inform the court if they continued to feel intimidated, and no response was received.
 
 
 21
 While the district court might have chosen to conduct an individual voir dire examination of the jurors, we cannot say, on the record before us, that the actions appropriately taken by the district court constituted an abuse of discretion, nor is it our view that the district court's determination that the jury was impartial was manifestly in error. See Mu'min, 111 S.Ct. at 1907.
 
 III
 
 22
 Defendant Baldwin also argues on appeal that there was such "a great disparity in the weight of the evidence" between him and the other defendants, see United States v. Mardian, 546 F.2d 973, 977 (D.C. Cir. 1976), that his being tried together with the other defendants resulted in substantial prejudice to him. Thus Baldwin maintains that the district court abused its discretion in denying his motion to sever the case against him from that against the others. See Fed. R. Crim. P. 8(b), 14. The claim has little merit.
 
 
 23
 The government charged all four defendants in the same indictment with having committed the same offenses based on the same incident, and "[b]arring special circumstances, individuals indicted together should be tried together." United States v. Brugman, 655 F.2d 540, 542 (4th Cir. 1981). The district court has a great deal of discretion in making a judgment as to whether to sever, see United States v. Odom, 888 F.2d 1014, 1017 (4th Cir. 1989), cert. denied, 111 S.Ct. 44 (1990), and the "spill-over" of evidence from one defendant's case to another's will provide grounds for reversal only where there is "a strong showing of prejudice." United States v. Mandel, 591 F.2d 1347, 1371 (4th Cir.), vacated on other grounds, 602 F.2d 653 (4th Cir. 1979) (en banc), cert. denied, 445 U.S. 961 (1980).
 
 
 24
 In this case, the government presented sufficient evidence to convict Baldwin, without the jury's needing to consider any of the evidence directed at the other defendants. The get-away van belonged to Baldwin's father and Baldwin had access to the keys prior to the robbery. Baldwin was discovered, shoeless, hitchhiking in a restricted area at Dulles Airport, near the scene of the robbery, and when questioned, Baldwin lied to an airport security guard. Shoes matching Baldwin's size were found near the get-away van. On the night of the robbery, Baldwin arrived at the home of his uncle, with an unidentified friend, where Baldwin asked to borrow a chain, arguably to be used to retrieve the get-away van from the ditch in which it was later found stuck. On the day after the heist, Baldwin gave his girlfriend a diamond and ruby ring, which she identified as similar to one lost in the robbery. And about a week before the robbery, Baldwin told his girlfriend, "I hope this thing go[es] through. I['ll] have me some money."
 
 
 25
 Additionally, the district court instructed the jury to consider the case against each defendant separately. See Yates v. Evatt, 111 S.Ct. 1884, 1893 (1991) (discussing the "sound presumption of appellate practice, that jurors are reasonable and generally follow the instructions they are given"). In light of these facts, we find no prejudice to Baldwin arising from his being tried with the other three defendants.
 
 IV
 
 26
 Defendant Weaver contends it was error to have admitted the trial testimony of Baldwin's girlfriend, Seletheia Moore, in which she related an out of court statement made by Baldwin which tended to incriminate Weaver. Seletheia Moore testified that on June 4, 1990, while she was visiting Baldwin in jail, Baldwin told her to call "Petey's" house and tell whomever answers to get rid of some muddy tennis shoes. "Petey" is a nickname for Weaver. Weaver objected to admission of the statement, contending that it was unreliable hearsay. Overruling the objection, the district court ruled that the statement by Baldwin is "not hearsay" because it was "a statement by a coconspirator of [Weaver] during the course and in furtherance of the conspiracy." See Fed. R. Evid. 801(d)(2)(E).
 
 
 27
 It is undisputed that the attempt to hide the muddy tennis shoes was an alleged act of concealment, which might be said to further the conspiracy by hiding its nature or extent. See United States v. Medina, 761 F.2d 12, 18 (1st Cir. 1985) (holding admissible statements regarding the burning of the Chevy Malibu ransom pick-up car "because the conspiracy continued so long as the conspirators were acting together to destroy incriminating evidence").
 
 
 28
 On appeal, however, Weaver argues that the statement is hearsay because it was not made during the course of the conspiracy. Weaver correctly points to the Supreme Court's decision in Krulewitch v. United States, 336 U.S. 440, 443-44 (1949), for the proposition that a mere act of concealment does not extend the life of a conspiracy beyond a point where "the central criminal objectives of a conspiracy have succeeded or failed." And it is well settled that Rule 801(d)(2)(E) "applies only if the statement was made in the course of and in furtherance of the conspiracy, and not during a subsequent period when the conspirators were engaged in nothing more than concealment of the criminal enterprise." Dutton v. Evans, 400 U.S. 74, 81 (1970) (plurality); see United States v. Blackshire, 538 F.2d 569, 571 (4th Cir.), cert. denied, 429 U.S. 840 (1976). Weaver claims that Baldwin's statement to Moore, made six days after the robbery and while Baldwin, Weaver and Williams were incarcerated, was made after, rather than during, the conspiracy to rob the Brinks truck, and that the statement as an act of concealment cannot, standing alone, serve as the means by which to extend the conspiracy for purposes of its admission into evidence.
 
 
 29
 In considering Weaver's arguments, we note that a criminal conspiracy, once established, is presumed to continue until its termination can be affirmatively demonstrated. See Hyde v. United States, 225 U.S. 347, 369-70 (1912); United States v. Sheffer, 896 F.2d 842, 844 (4th Cir.), cert. denied, 111 S.Ct. 432 (1990). The burden of proving a conspiracy's cessation rests on the defendant. See United States v. Walker, 796 F.2d 43, 49 (4th Cir. 1986). Furthermore, the determination as to whether a conspiracy has ended, for the purposes of Rule 801(d)(2)(E), is a factual determination to be made by the trial court and overturned on appeal only if clearly erroneous. See United States v. Grubb, 527 F.2d 1107, 1109 (4th Cir. 1975).
 
 
 30
 In this case, the district court considered the evidence and decided that Baldwin's statement was made during the course of the conspiracy. Although the actual robbery took place six days before Baldwin made the statement to Moore, the defendants failed to demonstrate that "the central criminal objectives of [the] conspiracy ha[d] succeeded or failed." See Grunewald v. United States, 353 U.S. 391, 400 (1957) (quoting Krulewitch, 336 U.S. at 443-44). Given the nature of the armored car heist and the proceeds derived therefrom, which included jewelry and foreign currency, the district court might reasonably have concluded that the objects of the conspiracy were not attained until the booty was converted to United States currency and divided among the conspirators. See United States v. Hickey, 596 F.2d 1082, 1089-90 (1st Cir.), cert. denied, 444 U.S. 853 (1979); United States v. Reynolds, 511 F.2d 603, 607 (5th Cir. 1975). Furthermore, the government points out that while several of the defendants were jailed at the time the statement was made, at least one co-conspirator remained free. Indeed, the only evidence which indicated the termination of the conspiracy, other than the time elapsed between the robbery and the statement, was the fact that two of the defendants each had given a piece of jewelry to a friend, which suggests only a partial division of the robbery's proceeds. The district court was not required, based on this evidence, to conclude that the statement made by Baldwin was not "made in the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). In light of the standard of review, we conclude that Weaver has failed to meet his burden.
 
 V
 
 31
 Defendants Baldwin and Taylor appeal their convictions under 18 U.S.C. § 924(c)(2), making illegal the use of a firearm during the commission of a violent felony. They argue that the government introduced no evidence of their use of a firearm during the robbery, and neither Williams nor Weaver was convicted on the handgun counts, even though the Brinks guards identified them and a third unknown suspect as the armed robbers. That Taylor and Baldwin were convicted on these charges, when Weaver and Williams were not so convicted, could, they argue, only have been a result of the jury's confusion.
 
 
 32
 At trial, the government argued for conviction of all four defendants on the handgun charges, under an "aiding and abetting" theory. Under United States v. Pinkerton, 328 U.S. 640, 645-47 (1946), a coconspirator is liable for the offenses of a confederate, so long as those offenses are reasonably foreseeable and in furtherance of the conspiracy. See United States v. Cummings, 937 F.2d 941, 944 (4th Cir.), cert. denied, 112 S.Ct. 395 (1991). The government points to the testimony of both Brinks guards as sufficient to establish that handguns were used in furtherance of the armored car robbery and conspiracy, not only by Weaver and Williams but also by a third unidentified robber. The convictions of Taylor and Baldwin on both the robbery and the conspiracy counts indicate the sufficiency of the evidence regarding their participation in the conspiracy. Thus, under Pinkerton, evidence of actual handgun use by Taylor and Baldwin was unnecessary to a legitimate conviction under 18 U.S.C. § 924(c)(2) even if no other co-conspirators were convicted. See United States v. Thomas, 900 F.2d 37, 40 (4th Cir. 1990) (holding inconsistent verdicts among co-conspirators is not a basis for challenge so long as evidence was sufficient to support the guilty verdicts rendered).
 
 VI
 
 33
 Finally, all three defendants appeal their sentences on the ground that the district court erred by enhancing their offense levels under U.S.S.G. § 2B3.1(b)(6)(G) (Nov. 1, 1989). That section provides that the base offense level for the crime of robbery shall be increased by six levels if the "loss" exceeds $2.5 million. The notes to § 2B3.1 refer to the discussion in the commentary to § 2B1.1 for further insight into the process of loss valuation. In turn, that commentary provides:
 
 
 34
 "Loss" means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim.... E.g., in the case of a theft of a government check or money order, loss refers to the loss that would have occurred if the check or money order had been cashed....
 
 
 35
 The loss need not be determined with precision, and may be inferred from any reasonably reliable information available, including the scope of the operation.
 
 
 36
 U.S.S.G. § 2B1.1, comment. (nn. 2 & 3).
 
 
 37
 The dispute over the loss involved in the Brinks robbery is centered around the valuation of three non-negotiable promissory notes, each with a face value of $1 million. The district court found significant the aggregate face value of the notes and accordingly increased the defendants' base offense levels by six levels. Had the district court decided to exclude the value of the notes, it would appear, based upon the value of the stolen jewelry and foreign currency alone, that an increase of no more than three levels would have been possible.
 
 
 38
 The defendants argue that the district court's inclusion of the notes' $3 million face value in its assessment of the loss was erroneous as a matter of law. First they maintain that the promissory notes, because they were not negotiable, had no "fair market value." See U.S.S.G. § 2B1.1, comment. (n.2). Second, the defendants argue that because the notes, themselves, were worthless, neither party to the promissory notes suffered an actual loss as a result of their theft. In response, the government contends that the notes' market value, even if negligible, should not be determinative in this case, and urges the court to adopt a definition of "loss" under the sentencing guidelines that is similar to that enacted in 18 U.S.C. § 2311 for categorizing the seriousness of certain property crimes. That definition states:
 
 
 39
 "Value" means the face, par, or market value, whichever is the greatest, and the aggregate value of all goods, wares, and merchandise, securities, and money referred to in a single indictment shall constitute the value thereof.
 
 
 40
 18 U.S.C. § 2311; cf. United States v. Jenkins, 901 F.2d 1075, 1084 (11th Cir.) (valuing stock certificates at face value while noting "[t]he fact that the stolen stock certificates may be canceled and new certificates may be issued in their place does not change the value of the items stolen for sentencing purposes"), cert. denied, 111 S.Ct. 259 (1990).
 
 
 41
 In reviewing the district court's decision to include the face value of the notes in calculating the loss under § 2B3.1, we note that the government bore the burden at sentencing of demonstrating by a preponderance of the evidence, the loss resulting from the armored car robbery. See United States v. Urrego-Linares, 879 F.2d 1234, 1239 (4th Cir.), cert. denied, 493 U.S. 943 (1989) ("[I]f the government seeks to enhance the sentencing range ... it should bear the burden of proof."). While we do not agree that an instrument's face value will always necessarily provide a reasonable indicator of the loss incurred by the theft of that instrument, if the instrument is authentic, the face value is generally a sufficient measure to establish a presumption in the government's favor for the purpose of valuing the loss under the sentencing guidelines.
 
 
 42
 In this case, the evidence presented to the district court was sufficient to establish that the notes were authentic and that they did in fact represent a promise to pay $3 million. That evidence is sufficient to impose on the defendants an obligation to demonstrate that the face value is not a legitimate indicator of loss under the circumstances. Importantly, the defendants produced no evidence indicating that the notes were not assignable, and therefore incapable of producing some benefit to the thieves through fraud or fencing. The statements made by counsel for the defendants regarding the "worthless[ness]" of the notes were conclusions, not facts. Cf. United States v. Blackburn, 940 F.2d 107, 109 (4th Cir. 1991) (holding "conclusory statements" insufficient to support factual findings at sentencing).
 
 
 43
 Although the issue is a close one, we agree with the district court's conclusion that the government met its burden in demonstrating the legitimacy of a six level enhancement under these circumstances.
 
 
 44
 The convictions and sentences of Albert Larry Weaver, Jr., Kevin Tyrone Baldwin and Kendal Taylor, accordingly, are affirmed.
 
 AFFIRMED
 
 45
 ERVIN, Chief Judge, concurring in part and dissenting in part:
 
 
 46
 I concur in all of the majority opinion except Part VI, from which I must respectfully dissent.
 
 
 47
 In my view, the plain language of the Sentencing Guidelines controls, and there is no need to resort to the evidentiary presumption the majority creates out of whole cloth. Under the Guidelines:
 
 
 48
 "Loss" means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. When the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim.
 
 
 49
 U.S.S.G. § 2B1.1, comment. (n.2). Here, the defendants argued that the non-negotiable promissory notes had no market value. As the majority notes, the government did not dispute that calculation but instead contended "that the notes' market value, even if negligible, should not be determinative in this case." Majority op. at 12. As I read the Guidelines' language above, market value is not determinative only when it is (1) "difficult to ascertain" or (2) "inadequate to measure harm to the victim."
 
 
 50
 As for the first possibility, I believe that the notes' market value was in fact easily ascertainable; it was nil. The majority states that the defendants might have received some benefit from fraud or fencing, but the majority cites no authority tending to show that one can fence, forge, pawn, or otherwise obtain value from $1,000,000 nonnegotiable notes. In fact, Brinks' own calculation of the total loss from the robbery was only $411,265.13. Brinks specified values for the foreign currency and jewelry but gave no value to the notes. J.A. at 1047-48. In addition, the majority's "fraud or fencing" point unfairly rests on the defendants' failure to show that the notes were non-assignable.[1] The majority recognizes that the government bears the burden of proof in seeking increased sentences. United States v. Urrego-Linares, 879 F.2d 1234, 1239 (4th Cir.), cert. denied, 493 U.S. 943 (1989). Therefore, I think that the government should have to show that the notes were assignable. In searching the caselaw of all jurisdictions, state as well as federal, I have found no cases that involved non-negotiable promissory notes that were assignable. I would therefore presume that the non-negotiable notes in this case were also non-assignable, as is usual, especially since the government bears the burden of proof. If both non-negotiable and non-assignable, the notes without doubt had an easily ascertainable market value -zero. See Denver & Rio Grande Western R.R. v. United States, 318 F.2d 922, 926-27 (Ct. Cl. 1963) (collecting cases).[2]
 
 
 51
 The Guidelines' other reason for looking beyond market value is when it is "inadequate to measure harm to the victim." U.S.S.G. § 2B1.1, comment. (n.2). The market value of the notes, zero, would not serve to increase the defendants' sentences at all. U.S.S.G. § 2B1.1. That lack of any increase in punishment might well be inadequate to measure harm to the victim, because the robbery of the notes probably caused some harm. When market value is inadequate, the Guidelines direct the sentencing court to "measure loss in some other way, such as the reasonable replacement cost to the victim." U.S.S.G. § 2B1.1, comment. (n.2). In my opinion, the district court erred in using face value as its measurement of loss rather than reasonable replacement cost.
 
 
 52
 Throughout history, the object of sentencing has been "to let the punishment fit the crime." W.S. GILBERT & ARTHUR SULLIVAN, THE MIKADO. The Guidelines accordingly state that"both the harm to the victim and the gain to the defendant" are relevant in determining loss. U.S.S.G. § 2B1.1, comment. (backg'd.). Here, the defendants gained nothing from the non-negotiable promissory notes. Therefore, any sentence increase must be based on"the harm to the victim." The victim here did not lose $3,000,000 but instead only had to replace the notes. Typically, to replace lost non-negotiable notes, a victim must purchase a bond for one per cent of the notes' face value. One per cent of face value here would be about $30,000. We have no information in the record as to replacement cost in this case, however, so I would remand for the district court to determine the replacement cost. I believe that an increased sentence based on that measurement of loss, rather than the notes' $3,000,000 face value, would let the punishment fit the defendants' crime. Such a sentence would also be consistent with the Guidelines, where"reasonable replacement cost to the victim" is the only suggested alternative to market value in determining "loss." U.S.S.G.s 2B1.1, comment. (n.2).
 
 
 53
 A holding that the loss when non-negotiable promissory notes are stolen equals their reasonable replacement cost would be contrary to the most similar case so far decided. See United States v. Jenkins, 901 F.2d 1075 (11th Cir.) (holding that value of non-negotiable securities should be determined by face value, not merely cost to replace stock certificates), cert. denied, 111 S. Ct. 259 (1990). Although the replacement cost (one per cent) was known in that case, the Jenkins court held:
 
 
 54
 The fact that the stolen stock certificates may be cancelled and new certificates may be issued in their place does not change the value of the items stolen for sentencing purposes any more than recovery of a stolen car changes its value for sentencing purposes. Jenkins took from his victims securities that were worth $101,741.64 to those victims in some way and at some time. The district court correctly computed his sentence based on this amount.
 
 
 55
 Id. at 1084.
 
 
 56
 I think that Jenkins was wrongly decided. For one thing, the Jenkins court confused an object's value with the question of whether it has been recovered, two different concepts. Further, the Jenkins court reasoned that in the case of a check or money order, "the value is that amount that would have been lost had the check been cashed, even if the thief could not have cashed the check." Id. (emphasis added). However, the Guidelines commentary that the Jenkins court cites applies to checks or money orders that could have been cashed and only stands for the proposition that it does not matter whether the thief has already cashed them. U.S.S.G. § 2B1.1, comment. (n.2). I think that non-negotiable securities and promissory notes are not covered by that commentary, because one cannot cash them. Although the majority does not endorse Jenkins, it reaches the same result through its face value presumption.
 
 
 57
 Finding that the issue is not close, I would reverse and remand for the district court to measure the loss by the only alternative method endorsed by the Guidelines and appropriate in this case-"the reasonable replacement cost to the victim."
 
 
 
 [1]
 Other than their face value and the fact that they were non-negotiable, little about the notes is in the record
 
 
 [2]
 Even if the government had shown that the notes were assignable, the defendants would not likely have exchanged them for anything approaching their face value. The majority seems to recognize this, in stating that assignable notes might only have produced "some benefit." Therefore, I would find it inappropriate to sentence based on the notes' face value even if the notes were assignable